Ben Levy, a resident of Shreveport, Louisiana, sustained physical injuries and was knocked unconscious when the automobile of his brother, Abraham M. Levy, being then operated by another brother, Louie Levy, left the highway and was wrecked two miles east of the town of Tallulah, Louisiana, about the noon hour of November 19, 1939. In a few days after the accident he began to act queerly, indicative of mental unbalance and was taken to Memphis, Tennessee, for treatment as a mental case. After a brief time he returned to Shreveport, not improved. His condition seemed to grow worse. He was admitted to the United States Veterans' Hospital in Gulfport, Mississippi, in the month of March, 1940, where he has since been a patient. His ailment was diagnosed as manic depressive psychosis. In September, 1940, he was interdicted by the District Court of Caddo Parish and Abraham M. Levy was appointed curator to him. The present suit was instituted by the curator against Louie Levy and the Indemnity Insurance Company of North America, carrier of public liability insurance on the automobile, to recover a large amount of damages, etc.
Plaintiff's action as against Louie Levy is predicated upon the following paragraph of the petition, to-wit:
"Upon reaching this point (two miles east of Tallulah) the said Louie Levy while driving the car fell asleep and lost control of the car, with the result that the car plunged into a ditch on the right-hand side of the road, wrecking the car and severely injuring Ben Levy."
No specific acts of negligence and/or carelessness are charged against Louie Levy in the operation of the car, except such as might be inferred from the act of falling asleep.
Plaintiff further alleges:
"* * * The injuries to the head and spine of the said Ben Levy and the severe nervous shock which he suffered as a result of his injuries were particularly serious in his case because of the fact that he had at a prior time in his life suffered from a nervous trouble which led to a mental disturbance sufficient to justify his interdiction by this Honorable Court. His interdiction was subsequently removed by this Honorable Court because of his complete recovery; but as a result of the shock and head and spine injuries which he received when the automobile plunged into the ditch as hereinabove related, he has become mentally deranged * * * ".
* * * * *
"Your petitioner believes and therefore avers that the said Ben Levy is now permanently incapacitated from engaging in any gainful employment and that for the balance of his life except in so far as he may receive a revenue from the investment of funds received as a result of the filing of this suit the said Ben Levy will be dependent upon others for his daily bread.
"Petitioner is informed and believes, and therefore alleges, that the said Ben Levy will suffer for many years and probably for the remainder of his life from the injury to his cervical vertebra to which reference has heretofore been made and will not again be able to hold his head erect and stand erect for any length of time without suffering very considerable pain.
"Your petitioner is informed and believes, and therefore alleges, that it is highly probable that the mental derangement of Ben Levy will continue, being sometimes better and sometimes worse for the remainder of his life."
The damages, etc., sued for are listed as follows:
"(1) Mental derangement .......................... $20,000.00 (2) Pain and suffering, past, present and future, from back injury ................................. 7,500.00 (3) Permanent physical deformity resulting from changed posture and inability to stand erect and hold up his head without pain ........................................ 7,500.00 (4) Loss of earnings for thirteen months ............................. 1,300.00 (5) Destruction of earning capacity and loss of future earnings ............................. 10,000.00 (6) Money accumulated prior to his injury and withdrawn from bank following injury and squandered ....................... 627.12 (7) Money borrowed from bank following injury and likewise squandered 300.00;" *Page 776 
also sanitarium expenses, physicians' and nurses' bills, and miscellaneous other expenses alleged to have been incurred in treating and caring for the interdict between the time of the accident and the date of his admission to the Veterans' Hospital.
Plaintiff attached to and made a part of his petition, a photostatic copy of the insurance policy sued upon. It contains what is commonly known as the omnibus clause, under which coverage is extended to any person operating the car with the owner's consent, with some exceptions. To make the trip, Louie Levy borrowed the car from Abraham M. Levy. Ben Levy's status was that of invited guest.
Defendants excepted to the petition as not disclosing either a right or cause of action. These exceptions are based upon alleged violation of the "cooperation" clause of the policy. They were overruled primarily because the question sought to be raised thereby could only be tendered as a defense to the merits. The court gave written reasons for its action. Reserving all rights under the exceptions, answers were filed on behalf of both defendants. The answer of Louie Levy was filed by the insurer's counsel. Levy testified that he never saw the answer prior to its filing, and, therefore, to that time was ignorant of its contents. He is made to deny therein all the essential allegations of the petition save that he lost control of the car and the occurrence of the accident. He affirmatively avers that he enjoyed a full night's rest prior to the day of the accident and had done nothing which would tend to cause him to be sleepy or drowsy on the day thereof, "and if he fell asleep while driving * * * such was not an act of negligence but was caused by factors beyond his knowledge"; and which could not be foreseen nor guarded against, the same being "an act of God". Further answering, this defendant pleads that he and Ben Levy were on a joint adventure when the accident occurred and for this reason, if none other, he is barred from recovery.
In the alternative, Louie Levy pleads that should it be held that he was in any manner negligent in the operation of the car, in such event contributory negligence of Ben Levy in that he observed the manner in which the car was being operated and failed to protest against same, and knew or should have known that he (Louie Levy) was falling asleep and failed to stop or awake him, bars recovery.
The answer of the insurer, plus the charge that the "cooperation" clause of the policy was violated in a manner sufficient to bar recovery, is practically the same as that of Louie Levy. With respect to the "cooperation" clause, it is alleged that it was the bounden duty and obligation of Abraham M. Levy, the named assured, to abide by and observe such clause and to this end to discourage and prevent, as far as possible, suits being filed against the insurer and liability being imposed upon it; that his failure to perform said duty, but on the contrary, to actively violate the same, rendered the policy invalid and ineffective. Amplifying these general allegations, seven distinct violations of the "cooperation" clause are alleged, a summary of which follows, to-wit:
By cooperating with his brothers and having himself appointed curator to Ben Levy in order that he could institute the present suit; by counseling and advising with his brothers prior to filing suit with the view of mulcting this defendant; by consulting with and employing attorney on behalf of Ben Levy in furtherance of a scheme to force this defendant to pay damages "to him and his said brother", and actually filing suit to accomplish said purpose; by paying and/or agreeing to pay court costs; by actively participating in the prosecution and trial of the case and furnishing evidence in support of the suit, etc.
The insurer also alleged that Louie Levy, under the terms of the policy and the facts of the accident, was an additional assured, and, excepting that he is not a party plaintiff, is guilty of all the acts of non-cooperation charged to Abraham M. Levy, and for these reasons the policy was likewise rendered invalid and ineffective as to him as the insured.
The lower court found and held that the cooperation clause had not been violated in such manner as to bar recovery by Ben Levy. It also held that Louie Levy fell asleep and lost control of the car, but further held that under the pertinent facts and circumstances it was not negligence for him to have done so. The suit was dismissed and plaintiff's demands rejected. This appeal is prosecuted by him.
The defenses of joint adventure and contributory negligence evidently have been abandoned as neither is seriously urged *Page 777 
here. They are void of merit. The three major issues tendered for consideration are:
1. Did the accident occur from the negligence of Louie Levy in falling asleep, or in other respects? If this question is affirmatively answered, the following question arises:
2. Has the insurance policy been invalidated and rendered ineffective by violation of the cooperative clause? If not, the following question arises and must be disposed of, to-wit:
3. Has it been adequately established, to serve as a basis for judgment, that there is causal connection between Ben Levy's present mental condition and the accident?
The insurer's answer tenders the basic facts involved in question two as its primary defense and those involved in the other two are pleaded in the alternative. In logical order, question one should be disposed of first.
We are not convinced that Louis Levy nodded or fell asleep immediately prior to the accident. He did not so testify and there is no other testimony whatever on the question. The circumstances refute inference that he did so. He and Ben Levy only witnessed the accident. The latter did not testify. To support our conclusions on this phase of the case we shall relate pertinent facts over a period of twenty-four hours prior to the accident, and quote from written statements of Louie Levy made prior to and since filing of suit, and from his testimony at time of trial.
When the accident occurred the Levys were en route to Vicksburg, Mississippi, to attend the funeral of a sister of their brother-in-law. The day prior to the accident Louie Levy went about his business affairs in a normal way. He retired at about ten:thirty o'clock that night, the customary hour for so doing. He arose at six:thirty the following morning, ate breakfast, picked up Ben Levy and was away on the trip one hour later. During the night his rest was broken three or four times on account of the illness of his two year old child. Not over one hour of sleep was lost thereby. Therefore, he enjoyed approximately seven hours of sleep during the night, a normal night's rest for a man of his age, forty-seven years.
From Shreveport to the locus of the accident Louie Levy drove the car. A stop was made in Monroe, one hundred three miles from Shreveport, where coffee was drunk. After this, and picking up a man who wished to ride to Tallulah, sixty miles farther east, travel was resumed. At Tallulah gasoline was purchased and the passenger alighted. The journey was again resumed but ended two or three minutes later with the accident. We say this because in one of Louie Levy's written statements introduced in evidence, he declared that the car was making sixty or sixty-five miles per hour when the accident occurred, and the locus thereof is only two miles east of Tallulah. He was not questioned about the speed when on the witness stand.
The accident occurred on a straight section of the eighteen foot concrete highway, which, at the time, was dry and free of traffic save the Levy car. Louie Levy testified as follows:
"Q. Do you know how that accident came to occur? A. I could not say positive, no, sir."
* * * * *
"Q. State what you know and recall that happened. A. I was just a short ways out of Tallulah, and while I was riding along apparently something happened. I have a faint recollection of trying to pull the car back on the road, and the next thing I know I was dazed and the car had been turned over and shortly thereafter I have a faint recollection of having been taken in an ambulance to a sanitarium in Tallulah.
"Q. Do you have any recollection of the car going off the road or leaving the pavement? A. I just have a feeling that I tried to pull the car back on the road and then it was all over.
"Q. At that moment you were off the road? A. I, however, was trying to pull the car back on the road."
* * * * *
"A. I figured I must have nodded and gotten off the road."
In notice of the accident to the insurer, the facts thereof are given by Louie Levy as follows:
"Going to funeral at Vicksburg, Mississippi. About two miles out of Tallulah steering apparatus apparently went bad as road was clear of cars and no reason for accident as was plenty driving room."
The car was examined by a competent mechanic after being brought back to Shreveport and the steering apparatus was *Page 778 
found to be in perfect condition. Mr. Levy then decided that he must have lost control by nodding, as on December 11th, five weeks after suit was filed, he wrote and signed for the adjuster another statement about the accident and antecedent facts, in which he said:
"I cannot say positively what caused the accident. I believe I must have nodded and the car got off the pavement onto the shoulder and I have a feeling I tried to get it back onto the highway."
But in his testimony he did not positively say he fell asleep. He left to conjecture just why he lost control of the car. However, subsequent to this latter statement he signed another in which he said:
"About two miles out of Tallulah the car in some manner got off the highway and in pulling it back on the shoulder of the highway the car swerved and turned over."
Louie Levy does not say that he became sleepy or drowsy between Shreveport and Monroe nor between Monroe and Tallulah. If he had done so, surely he would have said so. Since he did not say or testify that he did so, the logical inference from his silence is that he had no such experience. Even though he had been sleepy or drowsy before reaching Tallulah, the stop there would have aroused him and served to restore normal physical and mental conditions.
It is common knowledge that sleep does not come on suddenly and unheralded, but, on the contrary, slowly, and so much so that one is definitely impressed of its approach before unconsciousness ensues. To say that Louie Levy fell asleep after leaving Tallulah, in view of the facts and circumstances, certainly contradicts every day human experience and ignores facts known to everyone.
In their answers defendants denied the article of the petition (quoted above) wherein it is affirmatively alleged that Louie Levy fell asleep and lost control of the car. Notwithstanding this denial and the glaring inconclusiveness of the evidence on this issue, defendants in brief virtually admit that the accident was caused by Louie Levy falling asleep but counter with the contention that under the pertinent facts and circumstances it was not actionable negligence for him to have done so. On the other hand, plaintiff in brief, admits that Louie Levy does not know why he lost control of the car.
It is obvious from plaintiff's allegations, he theorizes that the facts of the case bring it within the operative effect of the maxim res ipsa loquitur, since no specific charges of unqualified negligence are accredited to Louie Levy in the operation of the car; and it is so argued here. In keeping with this position, plaintiff contends that when he proved that loss of control of the car was due to the operator's falling asleep a prima facie case was thereby made out from an inference of negligence, and that it then devolved upon defendants to overcome by adverse proof this prima facie case if they would escape responsibility for the results of the accident. The argument is sound but the contention is untenable, in view of the conclusion we have reached anent Louie Levy falling asleep.
There is no precedent in this state, but the overwhelming weight of authority in other jurisdictions sustains the contention that when it is proven an automobile accident occurred from loss of control due to the operator's falling asleep, an inference of negligence arises of sufficient strength to make out a prima facie case. The same authorities also hold that such inference is rebuttable; that is, the facts and circumstances attending the falling asleep may be such as to absolve the driver from the imputation of negligence. A leading case on these questions is that of Bushnell v. Bushnell, 103 Conn. 583,131 A. 432, which is reproduced in 44 A.L.R. 785. In that case, inter alia, it was held:
"The mere fact that one driving an automobile permits himself to go to sleep justifies an inference of negligence sufficient to make a prima facie case in favor of one injured by the car while he is in that condition, sufficient to support a recovery, if no circumstances tending to excuse or justify his conduct are proven."
A long array of authorities to support this holding is cited in the opinion.
5 American Jurisprudence verbo "Automobiles", page 605, § 180, states the rule to be as announced in the Bushnell case.
The question now arises, since plaintiff has alleged specifically the cause of the accident, but has failed to substantiate the allegation by satisfactory proof, the proof otherwise establishing a case wherein the res ipsa rule does apply, are we warranted in applying the rule and adjudicating the issue on the record as presently made up? We think so. Defendants *Page 779 
say not and refer us to the case of Coffey v. Ouachita River Lumber Company, Inc., et al., La.App., 191 So. 561, wherein, as reflected from the syllabus, this court held:
"In action against truck driver, owner and insurance carrier, for injuries sustained by occupant, where both sides positively alleged facts which if true accounted for movements of truck resulting in accident, and both contentions were susceptible of proof, doctrine of res ipsa loquitur was inapplicable."
We do not think that case a precedent for defendants' contention. The facts and pleadings thereof are easily distinguishable from those of the case at bar. There, plaintiff specifically alleged the acts of negligence which he contended caused the accident and undertook to substantiate the allegations but failed. To this extent, the two cases are quite parallel. But in that case, contrary to the present one, proof of the alleged acts of negligence would not have warranted application of the res ipsa rule, but, on the contrary, would have repelled it. The alleged acts of negligence there were of such character, if sustained by proof, to have unqualifiedly fastened responsibility for the accident upon the employer's agent. Here, the situation is different. The car was in first class mechanical condition and was being operated by a competent driver on a straight, level section of a dry, concrete highway, free of traffic interference, and suddenly it left the road and was wrecked. Control of the car was lost for some reason. The undisputed facts, regardless of why control was lost, warrant application of the rule. Hamburger v. Katz et al., 10 La.App. 215, 120 So. 391; Lawson et ux. v. Nossek, 15 La.App. 207, 130 So. 669; Monkhouse v. Johns, La.App., 142 So. 347; Gomer v. Anding et al., La.App., 146 So. 704; Galbraith v. Dreyfus et al., La.App., 162 So. 246; Harrelson v. McCook et al., La.App., 198 So. 532.
The facts and pleadings of this case bring it within the rule announced by the Supreme Court of Arizona, in Pickwick Stages Corporation et al. v. Messinger, 44 Ariz. 174, 36 P.2d 168, to-wit:
"Allegation of specific acts of negligence restricts proof of both plaintiff and defendant to such alleged acts, but does not deprive plaintiff of benefit of the doctrine of res ipsa loquitur, where acts shown by the evidence would be within the rule under a complaint containing only a general allegation of negligence."
To support this ruling the court cites many cases from other jurisdictions.
Defendant Levy offers no satisfactory explanation as to why he lost control of the car, but, on the contrary, frankly confesses that he does not know the cause. Such testimony, of course, does not overcome the prima facie case.
The "cooperation" clause of the policy reads as follows:
"The insured shall cooperate with the company and, upon the company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits; and the company shall reimburse the insured for expenses, other than loss of earnings, incurred at the company's request. * * *"
Complementary to this clause the policy contains the following provision, to-wit:
"No action shall lie against the company unless, as a condition precedent thereto, the insured shall have fully complied with all of the terms of this policy * * *".
Whether or not the acts and attitudes of an insured, as regards rendering assistance to or cooperating with the insurer in a given case, violates the quoted clause, depends largely upon the facts of the particular case. No set rule can be formulated to control in all cases. The fact that Ben Levy, the named assured and the insured (Louie Levy) are all brothers, and that the named assured has been appointed by the court as curator of Ben Levy, and owes him not only a natural but a legal duty arising from trust relation, certainly removes this case in point of facts, from the general rule of cases of like or similar character.
In passing on the exceptions of no cause and no right of action, the trial judge said:
"We think that Louie Levy was the insured, quoad the accident here involved, and upon whom rests the duty to cooperate with the company for the reason that so far as the company is presently concerned, Abraham Levy had nothing to do with the matter and is in no way connected with it, has no liability and is not `insured' in connection with this accident.
"The purpose of the cooperation clause in the policy is to require the insured to disclose all of the facts within his knowledge and otherwise aid the insurance company *Page 780 
to determine its liability under the policy. It is not the obligation of an insured to assist the insurance company to defeat its liability. The obligation of the insurance company is to pay the damage (if liable) and not to refuse to pay
(regardless of liability)."
Soon after Ben Levy showed signs of mental disorder, his two brothers took charge of his affairs and acted for him, as might be expected of brothers, in a personal way until he was interdicted. They conducted negotiations with the insurer's adjuster, in the hope of securing an amicable settlement, until the agent finally disclaimed liability for his principal. The interdiction followed. It was initiated by both brothers who employed attorney to institute this suit. To this attorney Louie Levy impartially gave the facts of the accident insofar as he could recall them. He advanced the cost necessary to file suit and holds himself ready to advance other costs if needed to adequately prosecute the case. He complied with every request made upon him by insured's agents and concealed nothing from them.
Touching Louie Levy's connection with the case, the lower court, passing on the merits, said:
"* * * he was the only witness to the accident and gave plaintiff's counsel all the information that he had with reference to how the accident occurred. He attended the trial of the case and on trial gave the same facts that were contained in the statements furnished defendant, and so far as the record goes he concealed nothing, and complied with every request made on him by the Insurance Company.
"We do not find that any act or statement of Louie Levy has prevented the insurer from defending itself against the claim of plaintiff. We do not think it would be wrong for an assured to give a plaintiff a statement of the true facts known only to the assured, if he gave the same facts to the insurer, or to put up money with which to finance a suit if the insurer had not settled the case within eleven months (as in this case) where the plaintiff is the brother of the assured and incapable of looking after his own affairs. For the reasons above given and those stated in the written opinion overruling the exception of no cause of action based on the same plea, we think that the defense of lack of co-operation has failed."
* * * * *
"We do not view the matter in the same light with counsel for defendant and go to the extent of charging Mr. Louie Levy with moral turpitude. We must remember that he is the brother of Ben Levy; that he was the only witness to the accident in the case, and, from his testimony it appears that he has always been open and above board in giving all the information he had about the matter and concealed nothing. Of course, in considering the weight of his testimony, although he is a defendant in the case, we are convinced that his interest is with the plaintiff, and that if any emphasis is to be placed on his testimony it is in favor of the plaintiff — that is to say, if there was any fact to be given that would be favorable to plaintiff he would be more apt to give it than to refuse to give it; and if some fact could have been emphasized to the detriment of plaintiff it was not emphasized.
"The set-up is not the same as if Louie Levy was being sued by a stranger for a large judgment, for in that case we would naturally find a defendant giving emphasis to facts in his own behalf and not emphasizing facts in favor of plaintiff."
We have carefully studied the "cooperation" clause in the light of the uncontroverted facts and are unable to see wherein the obligations therein imposed upon the insured have been essentially violated. The lower court's ruling on this phase of the defense, in our judgment, is sustained not only by the weight of authority, but is just.
6 Blashfield Cyclopedia of Automobile Law and Practice, § 4059, p. 415, states the applicable rule in this language:
"However, in order that there may be a breach of the condition requiring the insured to co-operate with liability insurer, so as to avoid the latter's liability under the policy, lack of co-operation must be material; and it is necessary, in order to establish a defense under such a provision, that the insurer show that the failure of the insured to co-operate with it was of such gravity as to prejudice it."
There is respectable authority to sustain defendant's contentions, including Appleman on Automobile Liability Insurance, but we prefer to follow the rule quoted from Blashfield.
Ben Levy is a bachelor fifty-one years old. In the years 1914, 1922, 1926 and 1929 he suffered mental disorders similar to that which now afflicts him. The disorders *Page 781 
were then diagnosed as dementia praecox.
Psychiatrists say that it is exceedingly difficult to positively distinguish between dementia praecox and manic depressive psychosis. Observation of the patient for years is ofttime necessary to make a correct diagnosis. The exact original cause of either of these afflictions has not been determined by scientists. Psychic trauma, grief, sorrow and brooding are the most common causes for recurrence. It is also established that there is no permanent cure for either ailment; that recurrence will take place without known reason therefor, followed by interval of lucidity; that generally recurrence is more frequent and of greater duration as the patient advances in years.
Dr. Isham Kimbell, clinical director of the Veterans' Hospital in Gulfport, Mississippi, has specialized in Psychiatry for nineteen years. He undertook to briefly state the difference between these two maladies, and in doing so, said:
"The patient who suffers from manic depressive psychosis, in spite of the fact that he does have a mental disorder and in some instances reacts to delusions and hallucinations, does not get out of touch with his surroundings. He knows who he is and where he is and all that sort of thing, whereas the patient who has dementia praecox is not in touch; he is diffident. Everything that happens is directly against him or has something to do with him physically, mentally or otherwise, and, as a result of that, to use a slang expression, he gets in his hole and pulls it in behind him; whereas the manic, he will hear the automobile and make a little rhyme on it, or hear some noise and talk about that. Everything that happens means something to him, you know; he is hyperactive, full of vim and vigor. The praecox has slowed up; he has regressed; he has gone to what we understand as a lower biological level. * * *"
Plaintiff contends that since Ben Levy had been free of mental disorder for some nine years, and that symptoms indicative of recurrence having manifested themselves within a few days after the accident, evolving into his present condition, there is direct causal connection therewith and the accident. Defendants parry by saying that the recurrence was purely coincidental.
In the accident, Ben Levy received lacerations of the scalp and many contusions; the spinous process of the seventh cervical vertebra was materially injured. He was severely jolted and shocked and was unconscious for about twelve hours. Pain of a serious character existed for some time but gradually lessened with time and treatment. The back of the head caught the greater part of the blow from the impact.
The physicians who testified are divided in their opinions as to whether physical trauma will bring about a recurrence of either dementia praecox or manic depressive psychosis. All agree that psychic trauma may do so. Shock to the nervous system is one form of psychic trauma.
We shall not encumber this opinion with discussion of each doctor's testimony on this very interesting theme but from a mature study of such testimony we are convinced and hold that the preponderance thereof, especially that of the psychiatrists, supports plaintiff's contention.
It is not shown, nor can it be definitely shown, that the physical trauma itself had a predominating influence in producing a recurrence of the mental disorder, but it is practically certain the anxiety of and brooding by the patient over his condition and the fear of a return to insanity, in a large measure, at least, accounts for such recurrence.
Dr. Herold of the staff of the North Louisiana Sanitarium, where Ben Levy was treated after being returned from Tallulah, is not a psychiatrist, but we think him nearly correct when he said:
"I have no hesitancy in stating that the shock, anxiety and suffering from this accident caused a recurrence of his mental state."
He further testified:
"Q. Doctor, wasn't he very much upset over his condition with the idea in his mind that he might not be restored to normalcy? A. I think that was the main cause of his insanity.
"Q. He was very much worried about himself from the first? A. I think that was the predominating factor.
"Q. How long after he was received at the North Louisiana Sanitarium before, from your observation of the case, that you began to think that he possibly might be a mental case, that is, he might be in danger of having a recurrence of his old mental trouble? A. I feared that and suspected it right away, but I was not convinced until he had been there for a week or so, when he insisted on a great deal more attention than I thought he actually needed. *Page 782 
"Q. Did you speak to Louis Levy, a brother, of Ben Levy's mental condition and cautioning him to watch him? A. Yes, sir.
"That was when he was the first time in the North Louisiana Sanitarium, November 20, 1939? A. Yes."
Dr. Duncan was of the opinion that the "injury acted as an exciting and precipitating cause" of return to mental unbalance.
Whether or not Ben Levy will again enjoy lucidity is a debatable question. It is beyond the ability of anyone, regardless of learning, to positively say one way or the other. Dr. Kimbell says the diagnosis is not favorable, but he and the other physicians frankly admit that what may be said on the subject is merely opinion, largely guesswork. It is true that to the present time the insanity has lasted four times as long as it did in any one of the other instances; however, in view of the well known characteristics of such an ailment, including the knowledge that as a rule recurrence is more frequent and of longer duration as the individual grows older, it cannot definitely be said or held that rationality will not return. Dr. Kimbell also observed him in 1929 and testified that his present condition is worse than it was then.
It is apropos to here briefly relate the history of Ben Levy's case following his insanity in 1914. He served two years in the military service during the first world war, and so far as the record discloses, had no mental disorder during that service, nor thereafter prior to 1922. In each instance of insanity, he was given appropriate treatment in private and/or public institutions and in each instance discharged, not as permanently well, but as being in such mental condition as to warrant release. After the experience of 1929, he resumed normal living and habits, procured gainful employment, was economical and saved money, part of which he prodigally dissipated within three months after the accident. Some of his closest associates describe his condition between 1930 and the time of the accident as being entirely normal, but Dr. Herold testified that he was regarded as being "queer" during this period, reflecting characteristics peculiar to one who has gone through episodes of insanity.
Ben Levy was admitted to the North Louisiana Sanitarium in Shreveport, Louisiana, the day after the accident. He was discharged on December 12th. He was readmitted therein on January 10th and again discharged six days later. On March 2nd, he again became a patient in that institution and was discharged two days later. In all, he spent thirty-one (31) days in this sanitarium. While not in the sanitarium and until he was taken to the hospital in Gulfport he was at large but did not resume work. During this time he succeeded in spending his cash accumulations and several hundred dollars additional, which he borrowed. The total of these expenditures is $1,335.03, represented in over fifty checks. This amount is sued for on the theory that it was squandered by Mr. Levy because he was mentally deranged. To prove this item a copy of the bank's ledger sheet was admitted in evidence. The canceled checks were not offered. We are without knowledge as to who the payees are. Evidently, some portion of the proceeds of these checks was spent by Levy for his own benefit or inured thereto, and for this reason, if for none other, the proof does not warrant favorable action on this part of the demand.
There appears to be no serious dispute over the miscellaneous expenditures by and for the account of Ben Levy from the time he was injured until admitted to the hospital in Gulfport. These amount to $1,410.93.
Wages for thirteen months at $100 per month are also sued for. This item is proven. It is not assailed as being an improper element of damages.
For pain and suffering and discomfort, we think an award of $750 adequate.
A much more serious question for solution is involved in determining a just and adequate award on account of mental derangement. This question would not be so difficult of determination if the derangement had occurred to one theretofore without such experiences and who had no tendency toward recurrence; nor if the proof supported a finding that the derangement was permanent. It has been often held in this state that where an injury activates or arouses a dormant condition, the injured person is entitled to recover for so much of his affliction as is the result of the accident. But here, the duration of the affliction is not susceptible of definite determination. It may pass away within the near future, but, on the other hand, may be permanent. There is no precedent in the jurisprudence of this state.
We do know that to the day of trial, March 6, 1941, over fifteen months *Page 783 
after the accident, the interdict was insane and wholly disabled to perform any gainful work. Beyond this we are not warranted in making a definite finding and to this time only can damages be fixed. To determine the amount of damages, in view of the singular facts of the case, it is obvious, is not destitute of difficulty. The question has had the most serious consideration of this court. Taking into consideration the allowance of wages for thirteen months, we have reached the conclusion that an award of Fifteen Hundred ($1,500) Dollars on damage account to the day of trial should be adequate.
For the reasons herein assigned, the judgment appealed from is annulled, reversed and set aside; and for said reasons, it is now ordered, adjudged and decreed that plaintiff, Abraham M. Levy, as Curator to the interdict, Ben Levy, do have and recover judgment in solido against defendants, Louie Levy and the Indemnity Insurance Company of North America, in the full sum of Four Thousand Nine Hundred Sixty and 93/100 ($4,960.93) Dollars, with legal interest thereon from judicial demand until paid, and for costs.
It is further ordered, adjudged and decreed that in all other respects the demand of plaintiff is rejected, save and except his right to sue for damages, if any, accruing since March 6, 1941, which is hereby reserved to him; and as to this portion of the demand, there is non-suit.