50 So.2d 38 (1951)
FRYE
v.
JOE GOLD PIPE & SUPPLY CO. et al.
No. 7595.
Court of Appeal of Louisiana, Second Circuit.
January 5, 1951.
Rehearing Denied February 8, 1951.
*39 Cook, Clark & Egan, Shreveport, for appellants.
Campbell & Campbell, Minden, for appellee.
TALIAFERRO, Judge.
This is an action ex delicto wherein plaintiff seeks judgment for a large amount in damages for physical and mental injuries sustained by him as the consequence of a collision between his own Ford gravel truck and a heavy pipe truck of the defendant, Joe Gold Pipe & Supply Company, which occurred June 28, 1949, on state highway No. 90, in Webster Parish. He also sues to recover the value of his truck, which was demolished in the accident, and for physicians', nurses' and sanitarium bills. The accident occurred near 10:30 A. M. about the center of a tangent that is .6 of a mile long.
Plaintiff was operating his own truck. It was going in a southerly direction. The other truck, traveling northerly, was being driven by a young Negro man named John Louis Carr, employee of the defendant.
The owner of the truck, being a copartnership, the individual members thereof and the Maryland Casualty Company, carrier of a policy of personal and property damage insurance on the company's truck, were all impleaded as defendants.
*40 The following acts of negligence, alleged to have been the cause of the collision, are charged to the Negro driver, Carr, viz.:
Operating the truck at an excessive and dangerous rate of speed at time of and immediately preceding the moment of the accident; not maintaining proper lookout, and failing to exercise the care, prudence and vigil that the conditions in and about the locus of the collision, at the time thereof, demanded; failure to exercise adequate control of his vehicle, when confronted with the unusual conditions on the road out of which the collision arose; operating the truck with brakes not in proper mechanical condition, the existence of which caused or contributed to the collision in that when suddenly applied, the truck, with trailer attached, suddenly jackknifed to its left across plaintiff's lane of travel.
Defendants deny the essential allegations of the petition, relied upon for recovery. They aver that the truck driven by Carr was brought to stop by him on its side of the highway immediately behind another stationary truck of the defendant, Joe Gold Pipe & Supply Company, and had been motionless several seconds when rammed by plaintiff's truck; that at no time was the Carr truck or trailer or any part of either, across the highway; that plaintiff's truck, as it approached the locale of the collision, was being driven at an excessive speed, under existing circumstances.
Lack of control, excessive speed, not keeping proper lookout, not staying on his side of the highway, on the part of plaintiff, are alleged to have caused the collision; and, alternatively, these alleged acts of negligence are pleaded in bar of recovery by plaintiff.
Trial of the case consumed three days. A large record was built up, some four hundred pages being therein. Judgment was rendered for the plaintiff in the following amounts, viz.:

Damage to truck $ 1,400.00
Medical & Hospital Expenses 3,002.95
Loss of earnings to date of filing
 suit 2,600.00
Loss of wife's income 600.00
Pain, suffering and shock 2,500.00
Permanent injuries and loss of
 future earnings 45,000.00
 __________
 Total $55,102.95,

and for all court costs.
The defendants appealed.
The trial judge, at conclusion of taking of testimony, in remarks to counsel, virtually decided the principal issue of fact; that is, the liability of the defendants for the consequences of the accident. This was afterward followed by written reasons to support the judgment from which appealed.
While not admitting liability to any extent, in the alternative, defendants challenge the correctness of each item making up the judgment. They argue, assigning their reasons therefor, that the value of the truck at time of the accident was not in excess of $500.00; that the bill of Dr. Cook ($1,850.00) should be eliminated entirely for lack of proof of its correctness; that no amount should have been allowed for loss of income of Mrs. Frye; that the award for loss of earnings of plaintiff to date suit was filed, should have been based upon his 1948 income; that no award for pain and suffering should be allowed.
They further argue, in the alternative, that the decision by this Court in Levy v. Indemnity Insurance Company of North America, 8 So.2d 774, should be followed; and should this not be done, judgment for plaintiff for loss of future income and earnings should not exceed $10,000.00.
The testimony pertinent to the question of responsibility for the accident is, to some extent, conflicting, yet we, as did the Lower Court, experience little difficulty in reaching the conclusion that the carelessness and negligence of the driver, Carr, created the emergency out of which the collision arose.
The Joe Gold Pipe & Supply Company will be hereinafter referred to as the defendant. *41 Its two heavy pipe trucks with attached float trailers, involved herein, left the City of Shreveport early the morning of June 28, 1949, destined for some place in the northern part of the state. They proceeded easterly on Highway 80 until the Dixie Inn community, three miles west of the City of Minden, was reached. The drivers tarried there for a few minutes, and then turned northward on Highway 90, which is surfaced with an asphaltic composition, eighteen feet (18') wide. The trucks traveled at a safe distance apart, the one driven by Carr being the most southerly. They were followed by a rural route mail carrier, named Hortman, who was in a passenger car. He soon passed both trucks and stopped at the mail box of one E. W. Faircloth, on the east side of the road, to deliver mail. The truck nearest to him, driven by a young Negro man by the name of Albert Sikes, stopped some twenty feet behind him. We think the testimony proves that about one-half of the Hortman car was on the paving and the other one-half was on the gravel shoulder at the mail box. To this point in the sequence of events there is no controversy over the facts.
The testimony of Carr is equivocal in some respects, while in other respects it is contradictory. He says he did not see the Frye truck until the moment it ran into his truck. There existed no reason whatever for him not seeing this truck coming toward him from the northern end of the tangent. It is obvious to us that he did see the approaching vehicle, perhaps belatedly, and this fact prompted him to undertake a sudden stop behind the Sikes truck. In the attempt to effect this stop, due to defective brakes, or for other reasons, his vehicle jackknifed across the road, the truck pointing southwesterly while the trailer pointed northerly up the road. When making this turn, the trailer slightly contacted the trailer of the stationary Sikes truck. The testimony leaves little or no doubt that Frye saw the Carr truck suddenly block his lane of travel and pulled his vehicle as far as he could to his right, partly upon the shoulder, but not far enough to miss ramming the other vehicle on its right front side. The testimony of the Negro boy Miller, riding with Carr, clearly supports these conclusions.
Sikes, driver of the forward truck, gave a lucid account of the facts as they transpired, immediately prior to the accident, insofar as he knew them. He says that he saw the Frye truck approaching, and for this reason, he stopped his truck behind the Hortman car to allow it to pass.
Hortman's testimony, if true, is difficult to understand. He says he did not see the Frye truck either prior to or after the accident, but heard the noise of the impact. He looked in that direction, saw the Carr truck and trailer upon the highway and Carr's assistant, the Negro boy, lying upon the road, yet he did not get out of his car to ascertain who had been injured, but, on the contrary, proceeded on his journey to deliver mail.
For reasons hereinafter stated, the testimony of Frye, himself, and of his companion, A. E. Frasier, riding with him, throws no light upon the facts of the accident.
Our conclusions, related above, are in keeping with those of the trial judge. We have no doubt of their correctness.
It is argued by defendant's assiduous counsel that the accident was proximately caused by Hortman's negligence in that he, without warning, suddenly stopped his car at the mail box, which forced Sikes to likewise bring his own vehicle to stop, and his action, necessarily required Carr to follow suit. The Lower Court expressly rejected this theory of the accident. We are sure the ruling is well supported by the testimony. The testimony of Sikes, Miller and Hortman repel such a theory.
Mr. Faircloth, sitting on his porch, some seventy yards from the scene of the collision testified that Hortman pulled his car to his left and crossed the highway (his route carried him westerly into an intersecting road) in front of the approaching Frye truck. We believe the witness in error, but, if not, Carr's negligence remains unaffected. We have held that he saw, or should have seen, the Frye truck approaching, *42 and the fact that Hortman's car temporarily obscured his vision up the road (if such happened) should have the more prompted him to reduce his speed commensurate with safety, in view of the unusual traffic conditions then and there prevailing.
Plaintiff's truck, from the force of the impact, turned over one or more times, and rested some forty feet west of the highway. It was for all practicable purposes demolished.
Both Frye and Frasier were knocked unconscious. They were promptly removed to a sanitarium. Strange as it seems, and coincidentally, both testified that after regaining consciousness they could not recall any fact or circumstances, as regards the accident. It seems that their memories are completely blank as regards the accident. Plaintiff could not even recall that he had made deliveries of gravel an hour or two prior to the time of the accident, although his memory concerning events, facts and happenings prior to its date, is remarkably clear.
Plaintiff was unconscious for six days. He remained a patient in the sanitarium for thirty days in all. He was attended by Dr. B. L. Cook of Minden. On first examination by Dr. Cook it was found that plaintiff's left ear and left arm, at the shoulder, were both almost torn off. He was then in a state of serious shock. The left side of his chest had been crushed and several ribs on that side fractured. There were bruises and contusions over other parts of his body. Competent and appropriate surgical skill succeeded quickly in restoring the ear and arm to normal position and functioning. The fractured ribs soon healed. There is now little or no residuary ill effects from these objective symptoms.
It was discovered, after plaintiff became conscious, that his right side was completely paralyzed. However, as the days passed, this ailment showed steady improvement.
The unconsciousness was the result of concussion, due to traumatism of the brain. Technically, the doctor says, cerebral encephalopathy.
The principal question in the case has to do with the brain injury, and its general effect upon the body.
After plaintiff left the clinic, he was under the observation of Dr. Cook, who continued to treat and prescribe for him. Referring to his general physical and mental condition Dr. Cook testified that the paralysis has largely disappeared from plaintiff's right side, but has left that part of the body weak; he has lack of ability to co-ordinate; the lower limbs have a tendency to "flop", which is characteristic of injuries such as he has; that he is mentally dull; his ability to control himself when vexed is gone. He additionally testified that he advised him to carry a crutch because he needed it to protect himself from falling; and that in his speech and actions he gives the impression of a boy of ten or fifteen years of age.
It was Dr. Cook's opinion that plaintiff is presently disabled to pursue any vocation, the duties of which he previously was qualified to perform, and, further that he did not believe he would ever be able to do so.
Drs. R. B. Van Horn and C. S. Sentell, of Minden, examined plaintiff physically,the former on March 23rd and the latter the following day. These doctors, like Dr. Cook, are general practitioners, and naturally, do not specialize in either neurology, psychiatry or neuro-surgery, but each has had considerable experience in the treatment of brain injuries and mental disorders, and each had, while preparing for practice, extensive training and education in that line of the profession. Drs. Van Horn and Sentell fully agree with Dr. Cook in his diagnosis of the brain injury with which plaintiff now suffers.
Admissibility of the testimony of each of these doctors was objected to by defendants' counsel on the ground that as neither was a specialist in the field of neurology, etc., he was incompetent to give opinion as regards plaintiff's ailment. The objection was overruled and the testimony *43 admitted subject to the objection. The Court ruled that the objection went to the effect rather than to the admissibility of the testimony. We believe the ruling correct.
Dr. D. H. Duncan, of Shreveport, specialist in the field of neurology and psychiatry, was called by Dr. Cook to assist him in treating and diagnosing plaintiff's case. He first saw the patient while he was confined to bed in the sanitarium, on July 9, 1949. Dr. Duncan's diagnosis at that time was contusion of the brain and traumatic delirium. He next saw plaintiff in his office in Shreveport on September 2nd. He had improved materially. The diagnosis then was traumatic encephalopathy (often referred to as "punch drunk" a diffused brain), characterized by incomplete right hemiplegia and general uncertainty and awkwardness in movements of the four extremities, and impairment of gait, and some motor speech disorder characterized by hesitancy and difficulty and uncertainty of speech.
X-ray pictures then made under Dr. Duncan's direction, as to fracture or other injuries of the skull, were negative. The patient was advised to report back in thirty days, and did so on October 3rd. His condition then was essentially the same as it was on second examination, except there was obvious improvement "both in motor function in the right extremities and in speech." He said: "He appears to be more alert mentally as a result of improvement in speech function." Dr. Duncan further testified: "At the time of the last two examinations, the possibility of neurosurgical consultation was discussed, but in view of the fact that examination findings to date do not disclose any indication of subdural hematoma or other definite surgical lesion, no definite plans have been made so far concerning neurosurgical consultation. The patient was instructed to stay in touch with Dr. Cook of Minden and report for examination in approximately one month."
He did not thereafter report back to Dr. Duncan.
Dr. Duncan is of the opinion that if his diagnosis of the brain injury is correct, there is no specific surgical treatment for it. He added that Dr. Dean Echols, teacher of neuro-surgery at Tulane University, The Charity Hospital, and the Oschner Clinic in New Orleans, agreed with him in his final diagnosis of the case.
It was Dr. Duncan's opinion that plaintiff was physically and mentally disabled to do heavy work. He would not venture an opinion as to the duration of the disability, with the light before him. Anent this subject, he said: "Some of them go on and have a remarkable rate of improvement, and others may have an awful lot of residual disability. * * * There are so many things that enter into it besides actual physical things, for that matter."
He was asked if it were not true that time alone would tell, and he answered: "Yes, I think so, assuming that what we found and what Echols found is accurate."
He also would not venture opinion as to whether or not it is possible for plaintiff to pursue or learn another occupation.
Dr. John B. Sutton, who specializes in neuro-surgery in Shreveport, examined plaintiff on February 17, 1950. The examination consumed about one and one-half hours, and was essentially negative except for his obvious impairment of memory and apparent drowsiness. He found no evidence of increased intracranial pressure, and added that it was impossible to finally and definitely diagnose the case without additional tests, X-ray pictures, and observation. He did not think anyone could give an intelligent opinion as to the exact cause of plaintiff's disability, nor as to whether or not the disability is permanent.
We experience no difficulty in reaching the conclusion that plaintiff at the date of trial of the case was totally disabled to perform the work required of one who hauls and delivers gravel, or any other sort of work that necessitates strong, physical exertion and a degree of intelligent thinking. His schooling carried him no further than the sixth grade. He is thirty-five years of age, and was very strong and vigorous before being hurt. He has earned a livelihood for himself, wife and children by hard, physical work. As to whether the *44 disability is permanent, the record is not at all conclusive, but it is as nearly established as could be expected in a case of this character. The only method of knowing exactly the character of the brain pathology is by a major operation. Plaintiff, alone has the power of decision of this question. There is no law of this state to compel him to do so.
As we understand Dr. Duncan's testimony it is that if the mental derangement is the result of a blood clot (sub-dural hematoma), relief therefrom by operative surgery would be expected and almost certain of attainment; but if the brain itself is in a diffused state because of the violence of impact, relief through operation would not be expected. It was his opinion and that of Dr. Echols that the symptoms do not indicate the existence of a hematoma.
Dr. Sutton's opinion does not, in reality, go counter to those of Drs. Duncan and Echols. He simply stated that he could not see how any doctor could intelligently and accurately diagnose the case without further tests, X-rays, observation, etc.
It is apropos to say that notwithstanding the lamentable condition of plaintiff's mind, as reflected from the testimony, the record discloses that he does not hesitate to drive a car alone several miles at a time on business. He was able to provide an accountant with necessary data upon which to base his 1949 income tax returns.
This case is not on all-fours with the Levy case supra. Here, the brain ailment is definitely attributable to trauma, but in the Levy case the accident involved only brought about a recurrence of a mental aberration, not originally due to trauma, that had developed at different times prior to the accident. In that case the doctors felt certain that normal functioning of the mind would be regained as previously, but could not and would not venture an opinion as to how long it would be. All agreed that the recurred condition was not permanent.
The writer of this opinion was the organ of the Court in the Levy case. Our decree in that case, due to its exceptional facts, reflects a departure from the uniformly observed rule in damage suits arising from physical injuries. It virtually split the cause of action, fixing the date of trial as the dividing line. The Supreme Court refused to review the case. The case is not a precedent for cases wherein the facts are like or very similar to those in the present case.
To determine a just award because of the injuries, deemed to be permanent, and practical destruction of earning ability, is not free of difficulty. In approaching the question we are reminded in plaintiff's brief of the reduced purchasing power of American money, and by way of some offset defendants have called our attention to the fact that the cause or causes for this depreciated value in our money have enabled plaintiff to acquire the fairly substantial income offered as a basis for fixing the measure of pecuniary loss in earning power, an income he was unable to acquire before the advent of such conditions.
In arriving at the large award herein the Lower Court took into consideration and evidently permitted it to influence him to some extent, the fact that the plaintiff has a wife and four children dependent upon him for support. In written reasons for judgment, it is said: "Though defendants objected to proof of his family, I believe that ought to be taken into consideration."
We have found no Louisiana case that supports this conclusion. The superior weight of authority in other jurisdictions holds it is not a pertinent fact to be considered in fixing the award in a damage case. 25 C.J.S., Damages, § 152, page 801; 15 Am.Jur. Verbo Damages, § 342.
We are of the opinion that the ruling is incorrect. If it were otherwise, the more children the injured plaintiff has, the greater the award to which he would be entitled.
Neither is the life expectancy a controlling factor to be considered in a case of this character. It is a factor to be considered along with other pertinent facts of the case. Dowell, Inc. v. Jowers, 5 Cir., 166 F.2d 214, 2 A.L.R.2d 422.
*45 The case of Weadock v. Eagle Indemnity Company, La.App., 15 So.2d 132, is strongly relied upon by plaintiff as providing a criterion for fixing the amount of damages in this case. The facts of the two cases are not nearly parallel.
In this case we believe for the permanent injuries and loss of future earning power, an award of Thirty-Three Thousand and No/100 ($33,000.00) Dollars adequate.

Value of the Truck
Plaintiff testified that he paid $1,900.00 for the truck with gravel body, in October 1947. It was a V-8 Ford, 1946 model. No testimony was adduced to prove that it had been used prior to plaintiff's acquisition of it, but as it was over one year old at that time, it is reasonable to assume that it would then have been classed as "used". In his income tax returns for 1948 and 1949 he took credit for depreciation on the vehicle at a stated cost of $1,000.00. And we are constrained to believe that is the amount he paid for it, and so held. Depreciation of twenty-five per cent (25%) on a vehicle of this character is allowed the owner. If it had cost $1,900.00, as contended, depreciation per year would have been $475.00, whereas at a cost of $1,000.00 the per annum depreciation is only $250.00.
An automobile mechanic estimated that it would cost $1,738.52 to recondition the vehicle. The wreck sold for $300.00. The Lower Court evidently adopted this estimate as the true value of the truck when damaged and deducted therefrom the price for which it sold.
The vehicle was over three years old at time of the collision. For some twenty months plaintiff had used it in the hauling of gravel, a very heavy substance, on trips of several miles. Such use of any sort of motor vehicle necessarily enhances heavy depreciation. If it had been repaired to the extent of $1,738.52 in new parts, it would have been practically new.
A new motor had been installed in the truck in the early part of 1949, at a cost of around $400.00. It is not shown what a new truck of the kind would have cost in June, 1949.
The income tax returns disclose that substantial amounts for repairs to the truck were expended during 1948 and the first six months of 1949. Its up-keep obviously was quite expensive.
It is not possible to determine with mathematical certainty the value of the truck when damaged, but we do not believe it then exceeded $1,000.00. And, since the wreck sold for $300.00, the difference of $700.00 is the amount of damages plaintiff sustained on this account. We believe this award liberal to plaintiff.

Loss of Salary of Wife.
It is alleged in Article XIX of the petition that at time of the accident, Mrs. Frye held gainful employment that yielded her approximately $125.00 per month, which she was forced to give up on account of her husband's injuries, in order to render to him needed attention and assistance; that as a consequence of this enforced action on her part she sustained loss to the amount of $600.00. The Lower Court included this amount in its judgment. We think this incorrect. Prior to and when the accident occurred, Mrs. Frye was in the employ of the School Board to drive one of its busses at a salary of $66.00 per month. This was the only employment she had at that time. She had not given it up at time of trial. She testified that for two weeks, after the accident, she worked in the school cafeteria at a wage of $4.00 per day. She testified that the duties of this job, plus operating the bus and services to her husband were too heavy for her to carry and that when Dr. Cook told her her husband would never entirely recover from his injuries she quit working in the cafeteria. These facts do not warrant recovery for any amount on loss of salary account. If this be not true, then, on this account, recovery could be had for an indefinite time.
Loss of Earnings to Time Suit Was Filed.
The Lower Court awarded $2,600.00 on this item.
Plaintiff worked at the shell loading plant, not far from Minden, Louisiana, during World War II. His wage at first *46 was $30.00 per week. This had increased to $60.00 per week when the plant ceased operations at the end of hostilities. Prior to this employment he engaged in truck raising, but this venture proved unsuccessful. Following termination of his employment at the shell loading plant, to the time of the accident, he devoted his energies to hauling gravel on an independent basis.
The record contains no evidence touching his income as gravel hauler prior to the year 1948, and all we have on this score for that year and for 1949 are his Federal income tax returns, which it is proper to accept, as regards gross income, for surely no one will exaggerate his income for the purpose of fixing a tax due the government. That is a close question. Said returns disclose gross income of $6,023.18 and net income of $2,321.49 for 1948, a monthly average net income of $193.45, and for the first six months of 1949, gross income of $3,958.86 and net income of $1,772.93, an average of $295.49 per month. The average net monthly income for the period covered by the returns was $244.69.
Suit was filed six months and six days following date of the accident.
We believe the safest course to follow in solving this question is to assume that plaintiff's net monthly earnings for the period between his injury and date of filing suit, would have been the same as he earned in 1949 to the time of the accident. This gives us a product of $1,832.00. And, we adopt this figure as the measure of loss in salary for said period.
Appellant does not assail the correctness of physicians', hospital and medical charges and expenses, except that of Dr. Cook, being for $1,850.00. It is contended that appropriate proof has not been adduced to support this bill, the reasonableness of which is challenged.
The bill presented to plaintiff by Dr. Cook, dated December 28, 1949, simply reads: "To professional servicesJune 28, 1949 to date$1,850.00." On the reverse side of this bill the doctor wrote "Estimate of future medical care is about $2,000.00."
While Dr. Cook was on the witness stand he was closely interrogated by defendant's counsel concerning the charges that made up the bill of $1,850.00. We quote from the note of evidence in order to accurately reflect what was said and done by witness, counsel and Court, regarding this bill, its admissibility, etc., to-wit:
"Q. Don't your records show how many times you saw the man? A. No. I saw the man anywhere from two to ten times a day, whether he needed to see me or I needed to see him. This is the country, and not the city where a doctor sees the patient once and then turns him over to an assistant. For instance, if he needed to be catheterized, I would go and catheterize him.
"Q. You have a busy practice, do you not, Doctor? A. Yes, sir.
"Q. How many patients do you see, normally, daily? A. I would imagine forty or up.
"Q. What is your usual charge for an office visit? A. $2.50.
"Q. What is your charge for a hospital visit? A. $5.00.

* * * * * *
"Q. How many times have you seen him since he left the hospital? A. I would have to look and check on that. I haven't the slightest idea, but an average of every week, or two weeks, or every month, since the last few months.
"Q. Didn't you make a record of the number of times you saw him? A. I can look and see about how many times, and about what charges were made.
"Q. Would you bring those to Court and give us the benefit of that? A. I will have to write them out. I have them in a little book.

* * * * * *
"Q. What you have outlined, is that the total of the treatment administered to him?
A. That is approximately it, yes.
"Mr. Yancey: That is all. If the Court please, Dr. Cook is going to bring his record in Court, and give us the details on the treatment.
*47 "The Court: You mean you want this itemized?
"The Witness: That is what I would like to know. Does he want an itemized statement on that thing?
"The Court: Is that what you want, Mr. Yancey?
"Mr. Yancey: If the Court please, I want to know more details on the treatment of Mr. Frye.

* * * * * *
"Q. Dr. Cook, is that a statement of your bill? A. Yes, sir.
"Q. Of the charges you rendered to Mr. Frye? A. Yes, sir.
"Mr. Campbell: We offer that in evidence.
"The Court: All right. I will let him offer it subject to your objection. He is going to itemize it for you anyway.
"Mr. Yancey: Do I understand the Court's ruling, that we have reserved the right to ask the Doctor further questions with reference to his bill?
"The Court; If you want to, after you see the bill.
"Mr. Yancey: All right, sir."
It is made clear from the foregoing discussions between Court and counsel that Dr. Cook was to make up an itemized account of his charges, produce it in Court and submit to further questioning concerning it.
Court recessed to meet on a future fixed date. On reconvening additional testimony was adduced. The following quotation from the note of evidence discloses what transpired at this sitting of the Court, regarding Dr. Cook's bill, viz.:
"Mr. Campbell: If the Court please, Dr. Cook sent this bill down here. If they want it, I want to put it in evidence.
"Mr. Yancey: It was the agreement, your Honor, that he would be here.
"Mr. Campbell: The directions of the Court were that he would send the bill.
"Mr. Yancey: I thought we would have the opportunity of examining him about it.
"Mr. Campbell: Your Honor suggested that he itemize it and send it down here.
"The Court: I told him to send the itemized bill. He testified about the bill, and what he did for the man. It is all in the record.
"Mr. Campbell: And, we want to put the bill they requested in the record, as P-19.
"Mr. Yancey: We object to the offering. It has not been identified by the witness and the witness hasn't yet itemized his services to the patient sufficiently to justify the charges that have been made.
"The Court: Well, I will let him file it subject to your objection, and if the objection is good I will not consider it. He testified at great length about what he did for the man, and I don't know what it actually shows.
"Mr. Egan: And, if the Court please, subject to the further objection we make that the witness has not been questioned as to the records from which he prepared the document offered, as to the time those records were made, etc.
"The Court: I don't want to bother Dr. Cook. As a matter of fact, he testified at great length about this. If you want to get another doctor down here to say his charges are unreasonable I will be glad to have you do that, if you want to do that.
"Mr. Egan: No, but I would like to know, among other things, if he made that up as a guess after the fact, or if it is a copy of records made at the time of the services.
"Mr. Campbell: I imagine he makes up a bill like I do. If a man owes me, I send him a bill.
"The Court: They don't ordinarily itemize them, but, of course, in this case, though, it is a question of taxing somebody besides the man for whom the services were performed. That man might be satisfied with an unreasonable charge, and agree to pay it, but if a third person is going to be called upon to reimburse for it, he ought to be able to show whether or not the charge is reasonable.
"Mr. Yancey: It is simply that this is not good evidence, if the Court please, and shouldn't be admitted at this time.
*48 "The Court: I have already ruled on it, and admitted it subject to your objection, and if I decide it is not any good when I go to pass on the case, I will not give him anything for it."
The bill referred to on its face, is practically the same as that first hereinabove mentioned. It is dated April 10, 1949. On its reverse side was written:

"First day, surgery, first 12 hour
 treatment .................... $620.00
$100.00 daily for 7 days, 4 or 5
 visits daily, spinal taps, blood,
 night visits, etc............. 700.00
22 days at $20.00 daily, visits,
 checkups, general case, etc... 440.00
9 visits $10.00 each, neurological
 checkup, etc.................. 90.00
 _________
 Total $1,850.00"

We are of the opinion that the bill, without supporting testimony, was not legally admissible in evidence. All concerned understood that Dr. Cook would appear again in Court and thus afford counsel for the defendants opportunity to cross-examine him about the bill. They have been denied this right. It did not devolve upon them to require the attendance in Court of Dr. Cook.

Pain, Suffering and Shock
The Lower Court allowed $2,500.00 on this account. Strange as it may seem, plaintiff experienced a minimum of pain and suffering as a consequence of his injuries. When he aroused from unconsciousness, the injured ear and arm had been operated upon and were healing in appropriate appliances. From then on it was only a question of time for complete restoration. The fractured ribs and crushed chest appear to have caused very little, if any, pain. Plaintiff's own testimony, that of his wife and physician, support this conclusion. He was asked by his counsel:
"Q. You were all well when you came to? A. All but this arm under here.

* * * * * *
"Q. When you first came to in the hospital, did you have any pain then? A. No, sir."
On this phase of the demand, Dr. Cook testified:
"Q. How was the healing as far as the ribs were concerned? A. They healed pretty nicely. We didn't have much trouble with the ribs. His whole condition was perfect except for the brain part of it. The cerebral part was the only thing that gave us a good deal of trouble. In fact, he hasn't complained of any of the other parts of it a great deal, except for the brain part. That has been the main thing all the way through."
Mrs. Frye was asked:
"Q. Did he ever seem to have any pain? A. Never any pain. He didn't remember any pain whatsoever.
"Q. He never complained to you of pain? A. No. He couldn't even feel the gash under his arm. It never did even hurt him."
An award of One Thousand ($1,000.00) Dollars will amply compensate plaintiff for the small amount of pain he experienced on account of the accident, and also for shock.
As regards the bill of Dr. Cook, no final pronouncement thereon can or should be made as the record now stands. As to this claim, the appropriate action should be nonsuit; and, it is so ordered.
For the reasons herein assigned, the judgment from which appealed is amended by reducing the principal amount thereof to Thirty-Seven Thousand Six Hundred Eighty-Four and 95/100 ($37,684.95) Dollars, and as thus amended, said judgment is affirmed. Costs of appeal shall be paid by the plaintiff; all other costs are assessed against the defendants.
KENNON, J., concurs.