(53 South. 857.)

No. 18,148.

McMAHON v. NEW ORLEANS RY. & LIGHT CO.

(Nov. 14, 1910. Rehearing Denied Jan. 3, 1911.)

*(Syllabus by the Court.)*

1. CARRIERS (§ 331*)—STREET RAILROADS—INJURY TO PASSENGER—CONTRIBUTORY NEGLIGENCE.

Where a passenger is permitted to stand on the front platform of a motor car, he has the right to assume that if there is any danger to him, requiring the closing of the gates of the platform, that they will be closed, and the same duty of closing these gates, when it is necessary for the protection of a passenger, rests upon an interurban railroad as upon a strictly city railroad.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 1376; Dec. Dig. § 331.*]

2. CARRIERS (§ 298*)—STREET RAILROADS—INJURY TO PASSENGER—NEGLIGENCE.

The employés of a railroad company must use every care commensurate with the danger to a passenger, and where a motorman of a street car fails to sufficiently slow down his car in rounding a curve, and a passenger, who has been standing on the platform with the motorman, is thrown out by the consequent jolting and is injured, the railroad company is liable.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 1205; Dec. Dig. § 298.*]

3. CARRIERS (§ 331*) — STREET CARS—INJURY TO PASSENGER—CONTRIBUTORY NEGLIGENCE.

The fact that the rules of a railroad company provide that passengers may stand on the platform only when there are no seats in the car will not preclude a passenger from obtaining damages for the negligence of the car crew because there were seats in the car and the passenger was riding on the platform with the sanction of the employés of the railroad company.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 1376; Dec. Dig. § 331.*]

4. DAMAGES (§ 95*)—PERSONAL INJURIES—DETERMINATION.

While there should be some similarity in the awards of damages for like injuries, still there is no exact rule for the measurement of damages, and the facts of each case must be the basis on which the amount in each case is predicated.

[Ed. Note.—For other cases, see Damages, Cent. Dig. § 222; Dec. Dig. § 95.*]

Provosty, J., dissenting.

Appeal from Civil District Court, Parish of Orleans; T. C. W. Ellis, Judge.

Action by Daniel P. McMahon against the New Orleans Railway & Light Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Dart, Kernan & Dart, for appellant. E. M. Stafford and H. W. Robinson, for appellee.

BREAUX, C. J. This was an action for damages, brought to recover the sum of $15,000 for personal injuries.

The case was tried by jury.

Nine thousand dollars was the amount allowed to plaintiff by the verdict and judgment.

Defendant prosecutes this appeal.

On the 23d day of July, 1909, plaintiff was thrown from the front platform of one of defendant's cars, a few hundred feet before reaching the West End terminus of defendant's line, near the platform known as the "Jackson Brewing Box."

Plaintiff, at the time of the accident, was a fireman in the employ of the New Orleans Fire Department, in whose service he had been for 18 years. He was earning $65 per month. His age was 44 years. His health was good.

On the day that he was hurt, he boarded the car about 1 p. m. at Basin and Canal streets. He was going to the lake to fish and enjoy a day's vacation.

He had a hand basket and a package, which he placed on the platform where he stood.

While on the platform, he held to a rod attached to the car in front.

Before he was thrown from the platform, he stooped down to take up his basket with his right hand, preparatory to his alighting from the car. It was then that he was thrown from the car.

There is a curve in the road where plaintiff was thrown out of the car.

127 LA.—18

The speed of the train was moderated a little on entering the curve, but not sufficient to prevent the jolting of the car.

Thomas J. Reed, a witness (an armorer of the Naval Brigade), who was a passenger on the train said that there is always a jolting when the car gets to the curve in question; passengers lean to the right as the West End train goes around the curve. He said that at the time the train was moving at the rate of about 18 miles an hour.

The other witness for the plaintiff testified to about the same effect.

The front gates of the car were open.

The motorman, on request of plaintiff, was to stop at the Jackson Brewing Box, where plaintiff was to alight from the car.

There were vacant seats in the car.

The train consisted of two cars—the motor and the trailer.

The contention of plaintiff is that when the train struck the curve there was a violent jolting, owing to the speed of the car, and it was then that he was thrown off.

He suffered severe injury. His foot was badly crushed and amputation was necessary.

He was carried to the Charity Hospital, where he remained four months.

His leg was amputated the first time about eight inches below the knee. The physician explained that it became necessary to perform a second operation and to amputate the leg at about four inches below the knee.

Plaintiff charges that it was negligence on the part of the defendant to leave the front gates of the car open.

Plaintiff testified that after the amputation of his leg he had sought work, and had failed to find it owing to the loss of his leg.

Defendant denies all liability, and charges that the injury suffered was through plaintiff's fault and negligence.

The speed of the car was not sufficiently

moderated while passing through the curve is the trend of the testimony for plaintiff.

We are of opinion that there is no question but that while running through a curve those in charge of the car should be watchful and careful in order, so far as possible, to protect the lives of the passengers. The care exercised should be commensurate with the situation.

With reference to the jolting of the car, the defense urged that there were no jolts, and referred to the testimony of passengers inside of the car who did not feel jolt or jars.

We have found that there is conflicting testimony upon the subject.

But, be that as it may, passengers quietly seated in the car may not remember when testifying as witnesses in regard to jolts. Those on the outside were in a better position to see the jolt or to feel it.

Moreover, the fact is that plaintiff was thrown out. This fall is not accounted for on any other theory.

The position of the defendant is that the curve amounted to very little.

The testimony is that years ago a curve was carved out of each side of the New Basin in order to enable schooners to pass. This curve on the east side of the canal has a shape of a half moon is the statement of one of the witnesses. In time, when a track was laid, this track was made to bend to the eastward in order to follow the curve.

Some of the witnesses mention it as a curve of forty-five degrees, and others, that it was a slight curve.

We infer that there was enough of a curve to cause jolt or vibration when the car was running at a full speed or near full speed.

The testimony is that it was running at about 18 miles an hour through this curve.

The motorman and the conductor knew that the plaintiff was standing on the platform. The former knew that plaintiff was standing behind him and that he had asked him to stop at the Jackson Brewing Box, and that he had assented.

The conductor collected his fare from plaintiff while on the platform.

Neither the motorman nor the conductor warned plaintiff of the least danger.

These two employés testified that passengers frequently ride on the platform of this train and that it is not considered at all dangerous to do so.

The rule is that passengers may ordinarily stand on the platform of the car if there are no vacant seats. If there are vacant seats and a passenger is allowed to remain on the platform without warning or notice it is not considered negligent on his part.

There are decisions in other jurisdictions holding that a passenger may ride on the platform whether there are vacant seats or not.

The case before us for decision is a stronger case for the plaintiff for the reason that he was seen by the employés on the platform, and they gave him some sanction for riding thereon by collecting the fare from him, as before mentioned, and in assenting to let him off at the Jackson Brewing Box, as above stated, while he was standing on the front platform of the motor car, near the motoneer.

The following decisions upon the subject are pertinent: Spurlock v. Shreveport, 118 La. 1, 42 South. 575; Brown v. Capital City R. R., 5 Street Railway Reports, 97.

It is stated in defendant's brief that plaintiff crossed over from the right to the left of the platform; that he was thereby negligent, and it was then that he lost his balance and fell over.

This is a contested issue of fact.

Plaintiff testified that he did not move from the right to the left; that he was on

the side of the platform from which he was thrown, picking up his packages preparatory to stepping off the car when the jolt came and threw him out.

The open gates at the front platform give rise to another question for decision. Plaintiff was standing on the platform of the front (motor) car, where generally these gates are kept closed while on the way.

The only defense at this point is that defendant's railroad should not be judged as if it were a city railroad.

To this we can only say that this road is at least interurban, if not entirely urban, and a street road. The train was moved by electricity from the city to West End, through grounds that are densely settled, except vacant spots here and there, of which it may be said "rures in urbe," for they all form part of the city of New Orleans.

The gates should have been closed. There was as much necessity for closing them as there is for closing the gates of a city car in front where the motorman guides the car. Interurban and strictly street cars are subject to the same regulation. Cincinnati R. R. Co. v. Lohe, Adm'r, etc., 68 Ohio St. 101, 67 N. E. 161, 67 L. R. A. 637.

Defendant's cars are as much city railroads as they are interurban.

One of the employés testified in regard to the open gate:

"Yes, sir: there are gates on the motor car."

But he said further that these gates are seldom used, unless the car runs over the Canal Belt. Why should they be seldom used except on the Canal Belt is an inquiry that is not answered by the testimony. There is evidently as much use for shutting these gates on the way to West End as anywhere else. Now, since the passengers were permitted to ride in front on the motorman's platform, it devolved upon the motorman to be careful and see that the gates were closed while the train was running and until the moment when the passengers are about to alight.

Defendant cites several decisions of courts of other jurisdictions, decided in favor of defendant, in which it appeared that plaintiff had knowledge of the situation.

Plaintiff was riding on the platform in view of the motorman and conductor, doubtless, without apprehending that there would be less control than the exigencies of the occasion required or that there would be jolt or vibration.

It is true that when plaintiff boarded the car at Canal he saw the gates open at the front platform. He would not have been heard by the motorman to object to the open gates at that time. There was no necessity for plaintiff's assuming that they would not be closed if the motorman saw the necessity of closing them at or near the curve before mentioned.

The duty of closing the gates was with the motorman.

Defendant charges that it was extremely negligent for plaintiff to go near the open gate and stoop down just as the car was about to enter the curve.

We understand that he stooped down to pick up his basket, as before mentioned, preparatory to stepping off.

Even if he was a little hasty in picking up these effects some little distance before reaching the Jackson Brewing Box, it does not appear that he was negligent, for he testifies, and he was not contradicted, that while doing this he held onto the bar in front of the car; that is, he held to the bar with one hand and stooped to pick up his lunch basket with the other.

In this one act, we have not found that there was negligence.

We have considered all the points, and have arrived at the conclusion that, as relates to negligence, the verdict should be affirmed.

Quantum of Damages.

That is the only remaining question.

The defendant's contention is that the jury having allowed $9,000, a sum in excess, defendant asserts, of that allowed for injuries many times severer, it should be reduced. It cites a number of decisions in support of its contention on this point, to wit: Bourg v. Brownnell, 120 La. 1009, 45 South. 972, 124 Am. St. Rep. 448, Roff v. Summit Lumber Co., 119 La. 571, 44 South. 302, and Yates v. E. L. & P. Co., 40 La. Ann. 467, 4 South. 250.

In these cases, the damages allowed were reduced on appeal.

Defendant cites the case of Conway v. R. R. Co., 51 La. Ann. 146, 24 South. 780. In that case, the damages were reduced from $8,500 to $6,500.

Plaintiff, in the last-cited case, was an old man. He also lost a leg.

In none of these cases are the facts entirely similar.

Damages are controlled, as to the amount, by the facts of each case. Although there should be some similarity, there is no necessity for its being absolutely similar in every instance.

For reasons assigned, the judgment is affirmed.

PROVOSTY, J., dissents.