**DOWELL, Inc. v. JOWERS et al.**

**No. 12020.**

Circuit Court of Appeals, Fifth Circuit.

Feb. 18, 1948.

Rehearing Denied March 18, 1948.
Writ of Certiorari Denied June 1, 1948.
See 68 S.Ct. 1346.

Val Irion, Harry A. Johnson, Jr., Max Maurice Morelock and Malcolm E. Lafargue, all of Shreveport, La., for appellant.

Harry V. Booth, of Shreveport, La., and Truett L. Scarborough, of Ruston, La., for appellees.

Before HUTCHESON, McCORD, and LEE, Circuit Judges.

LEE, Circuit Judge.

Appellees, plaintiffs below, are the widow and three minor children of Frank Jowers who was employed as a driller by the Penrod Drilling Company and who was killed on October 29, 1945, by an explosion which occurred during the bringing in of a gas well in Bienville Parish, Louisiana. Appellant, Dowell, Incorporated, defendant below,[1] is a corporation organized under the laws of the State of Michigan and duly authorized to do business in Louisiana. Jowers was in charge of one of the Penrod drilling crews which had drilled the well in question. When the well was completed, it was found necessary to acidize it, and Penrod employed Dowell to do the job. Jowers and his crew prepared the well for acidizing, after which the Dowell crew did the actual work of acidizing. When that work had been completed, Jowers and his crew commenced to bring in the well, and the well exploded,[2] killing Jowers. Mrs. Jowers, for herself and as natural tutrix of her children, brought suit for damages in the sum of $220,871.60 for wrongful death, in the Louisiana Court for the Second Judicial District, Bienville Parish. Upon petition of the defendant, the suit was removed on the ground of diversity of citizenship to the United States District Court for the Western District of Louisiana. The complaint alleged that during the acidizing process a choke was negligently removed from the flow line of the well by some member or members of the Dowell acidizing crew without notification to Penrod or Penrod's crew, and that as a result of that removal the well "went wild" when Jowers was bringing it in, exploded, and caused the death of Jowers. After all of the evidence was in, appellant filed a motion for a directed verdict, which motion was denied, and the jury returned a verdict in the sum

---

[1] The action was originally for an in solido judgment against both Dowell, Inc., and the Dow Chemical Co. Early in the trial, it being shown that Dow Chemical Co. had nothing to do with the well, a voluntary non-suit was entered as to it, and it thereupon passed out of the litigation.

[2] The petition alleges: "That after the said well was acidized as above alleged, the foreman of the crew that acidized it informed Frank Jowers that the acidizing process of the well had been completed, that it was ready to be brought in, and gave to the said Frank Jowers the 'high sign' to bring her in; that at this point, the said Frank Jowers proceeded to permit the well to blow in, and that the pipe and fittings located just behind the point where the choke was placed gave way, broke, and became disconnected, because of the great gas pressure exerted on the said pipe fittings of lesser strength, and because the said choke or safety device was not in the flow line; and that as a result of this breaking and pipe fittings becoming disconnected and because of the high gas pressure released, the said Frank Jowers was killed by flying pipe, pipe fittings, slush, and gas."

216

of $62,000 for the plaintiffs and the Hartford Accident & Indemnity Co., the insurer of Penrod, which, having paid compensation, had intervened as co-plaintiff in the action. Appellant appeals from the judgment entered upon the verdict and from an order denying its motion for judgment non obstante veredicto.

Appellant makes nine specifications of error, which, for convenience' sake, we shall condense to three.

(1) Appellant contends that the court erred in failing to grant its motion for a directed verdict or its motion to set aside the verdict.

(2) Appellant further contends that the court erred in accepting as evidence of a fact, and in submitting to the jury the testimony of one H. T. Poole; without Poole's testimony, which was offered only in rebuttal to impeach one of appellees' witnesses, there was no evidence whatever to justify submission of the case to the jury.

(3) Appellant assigns as error also certain statements made by the trial judge in his charge to the jury.

■ We take these assignments of error seriatim. Appellees insist that, since appellant gave no reasons for its motion for a directed verdict, "it is as if no motion was filed," and the defendant went to the jury without challenging the sufficiency of the evidence, so that no error can be attributed to the trial court on the score of overruling the motion. The record shows that the motion as filed did not "state the specific grounds therefor." Federal Rules of Civil Procedure, rule 50(a), 28 U.S.C.A. following section 723c. But incorporated in the record is the oral colloquy between the court and appellant's counsel. The court asked counsel why he thought a verdict should be directed in this case, and counsel's reply shows quite clearly that in his view the evidence had not proved the allegation of negligence in the complaint. We think that, in the circumstances, there was a sufficient compliance with the procedural rule, and that in the light of the conditions under which the case was tried it was reversible error to deny appellant's motions for directed verdict and for judgment non obstante veredicto. We think, however, that instead of a reversal with directions to enter judgment for defendant, given the circumstances, the reversal should be for trial anew.

Because the case is to be retried, some analysis of the evidence seems desirable in order thoroughly to clarify our position with respect to the second and third assignments of error. To describe clearly the process of acidizing and bringing in an oil well would unduly lengthen this opinion; so also would a detailed account of the particular operation in the case before us and its unfortunate consequences. Suffice it to say that at a point in the flow line leading from the well into a slush pit, a flow bean or choke is inserted which is both a safety device to control the flow of gas from the well in order to help prevent possible explosion of the kind that happened here, and a device to control pressure in the well during the process of acidizing. The evidence is clear that before or during [3] acidation of the well in question the deceased and his helpers were ordered by Thomas, Penrod's tool-pusher who was in charge generally of all the operations, to put in a choke for the purpose of building up pressure in the well, and that they did so. Every member of the Dowell crew and all but one or possibly two of the Penrod crew who had been present at the well during the operations on that day testified at the trial. Not one had removed the choke or seen anyone else remove it. All that the evidence shows is that the next day one of the Penrod employees found that part of the flow line in which the choke should have been, and there was no choke in it.

The evidence is clear that while a choke in the flow line may in some cases retard the process of acidizing a well, in this type of well a choke was essential if sufficient pressure to do the job was to be maintained.

---

[3] Of the seven witnesses who testified that they knew that the choke had been inserted by Jowers, three were uncertain as to when it was done, two said that it was done before the acidizing began, and two, the tool-pusher in general charge and the foreman of the acidizing crew, said it was when the acidizing was about half-completed.

Appellees' insistence that the function of this choke *in this case* was solely that of a safety device and that the choke was a hindrance to appellant in acidizing cannot be sustained, but it is just upon this point that confusion arises. The testimony of all the witnesses is to the effect that if, when a well is ready for acidizing there is mud and slush in the well, the presence of a choke in the flow line will hinder the flow of mud and slush from the well and so retard operations; but that this well was full of water and that in such a case a choke is necessary in order to retard the flow of water as it is displaced by the acid, and so build up and maintain the proper pressure in the well. But one witness, E. F. Hall, an employee of appellant, was called as on cross-examination by appellees and was confronted by appellees' counsel with a statement[4] he had made after the accident to one Swift, an agent of Penrod's insurer. The statement as a whole was not offered in evidence, but certain sentences from it were quoted out of context by appellees' counsel and so read into the record. Upon questioning, Hall admitted that he had made the statement. It seems to us probable that the quoted sentences deal with Hall's description of the process of acidizing wells in general, not of the process of acidizing the particular well in this case. Hall's testimony read as a whole leaves no doubt that as to this particular well a choke in the flow line was essential to the maintenance of adequate pressure, and so he may be said to join the other witnesses in their unanimous testimony of necessity. But there remains that partial statement read before the jury, and made nearer to the time of the accident. The jury may have been impressed by this, and although we cannot say there was a total absence of evidence tending to show a reason for appellant to have removed the choke, we think there was not sufficient evidence on the point to go to the jury.

Appellees refer us to the record for testimony[5] that there was mud and slush in the well, the presence of which would give a reason for removal of the choke. A reading of this testimony shows that mud and slush were mentioned only by counsel in his questions and always coupled with another word or phrase, "and such" or "fluids." The witness' answers, "yes," were undoubtedly in assent to "and such" or

---

[4] "Q. Did you not make a statement to Mr. Swift on April 17th, 1946, that it was the usual procedure 'while we are putting acid into a well, the usual procedure is to remove the choke so we can go faster with the acid'—you made that statement to Mr. Swift? A. I don't remember if I made the statement or not.

"Q. Do you deny that you made it? A. No, sir, I do not deny it."

[5] "Q. Now, Mr. Hendrick, the tubing was what diameter? A. That was two and one-half inch tubing.

"Q. That went all the way to the bottom of the well? A. Yes, sir.

"Q. And then the flow route—the connecting of the tubing, or whatever it was was that it would flow back to the top—the mud, slush and such? A. Yes, sir, it was.

"Q. Now, as it is forced back up to the top—the mud, slush, other fluid there, does it have an outlet? A. Yes, sir.

"Q. What is that called? A. The outlet is called the valve.

"Q. Or flow line? A. Yes, sir.

"Q. Then the fluids that you injected went down through the tubing, to the bottom of the well, into the limestone, and came back up through the casing and into the flow line? A. No, sir, not quite.

"Q. Please explain? A. When we pumped the acid into the tubing correctly, as I said, then at that time we had a displacement of fluid that comes up through the space between the tubing and the casing, we call it the annular space, and that space in the entire well was filled with water when we got there; we displaced all the water and the water comes out the casing and when we spotted the acid to a certain level of the casing in the annular space we shut off and the acid never comes to the surface again.

"Q. Did you have any fluid from the well, any flow at all, when you are doing that, putting in the acid, or during the course of the process? A. Yes, sir, we do.

"Q. And that goes out through the flow line? A. Yes, sir.

"Q. Now, in that flow line was there placed a flow bean, or choker? A. I know that our engineer in charge asked Mr. Thomas to have a flow bean placed in the well before or during the period of the operation as we saw that it was needed."

"fluids," since he says unequivocally that "the entire well was filled with water," a statement corroborated by other witnesses later in the trial. Appellees' reliance upon this testimony is incomprehensible. It is against, not for, their contention.

Another witness, J. H. Poole, testified for appellees on this point. Upon direct examination he said that after the acid had been pumped into the well, the Dowell men were in process of taking down their equipment when pressure in the well became so great as to push a cable out of the tubing faster than the men could coil it. At that time, he testified, the flow of the well was reversed, and then there would have been a reason to remove the choke. But on cross-examination immediately after this statement, Poole testified that the flow could have been reversed without removal of the choke. Poole had heard the order given by Thomas to Jowers to insert the choke, but he had not seen Jowers do it; nor had he seen anyone remove the choke. His testimony as to possible reasons for removal is on its face entirely theoretical.

██ Apart from these bits of testimony, there is no probative evidence to show that removal of the choke could or would have

served a useful purpose during acidation, and certainly there is none in the entire record to show that any of the Dowell crew did remove it. The uncontradicted evidence is that Thomas, Penrod's tool-pusher, was in general charge of the drilling, acidizing, and bringing in of the well. During acidation, Wenk, the chief of the acidizing crew, consulted with Thomas about the work, and it was on orders from Thomas, not from Wenk, that the choke was put in by Jowers. If the choke was removed during acidation, it must be inferred that it would have been done only on orders from Thomas. Both Thomas and Wenk testified positively that throughout the operation they needed the choke and had not ordered it removed. The only testimony to show that appellant's men removed the choke was that of one H. T. Poole, a Louisiana State Conservation agent, whose testimony was offered in rebuttal to impeach appellant's witness Hall. The testimony is set forth in the footnote.[6] Such testimony can have no probative value; it affects only the credibility of the witness impeached. State v. Bodoin, 153 La. 641, 96 So. 501; Wigmore on Evidence, § 1018, and cases cited. Without H. T. Poole's testimony there is no evidence of any kind tending to show

---

[6] "Q. Now, Mr. Hall, do you recall talking to Mr. H. Tate Poole, who is an agent of the Conservation Commission of the State of Louisiana, the night of the explosion? A. I don't remember talking to him.

"Q. You remember seeing him about three-quarters of a mile from the well? A. Yes, sir.

"Q. And you were discussing the explosion? A. I don't think I discussed it.

"Q. Did you ask what part of the fitting blew off? A. No, sir, he did not ask me.

"Q. You saw him? A. Yes, sir.

"Q. You deny you talked to him? A. I do not say if I denied it.

"Q. I ask now if it is not a fact that on the evening of October 29th, 1945, the night of the explosion that you met Mr. H. T. Poole, an agent of the Conservation Commission of Louisiana, about three-quarters of a mile from the well, and then and there told him 'we took the choke out of the nipple'? A. I said that? Not I, no, sir.

"Q. You did not say that? A. No, sir.

"Q. You deny having said that, or anything similar? A. I do not remember even having said a word to him.

"Q. Who were you with? A. In Mr. Wenk's car.

"Q. And you deny having told him at that time and place, right after the explosion 'we took the choker out'? A. Yes, sir.

"Q. I ask that for the purpose of impeaching your testimony, and I ask if you told him at that time and place 'we took the choke out of the flow line'—you did not tell him that? A. No, sir, I did not.

"Q. That is all.

*   *   *   *   *   *   *

"Q. Mr. Poole, I want to ask you if you had a conversation with Mr. Hall, E. F. Hall, on the night of October 29th—or the morning of October 30th, 1945, on a road near the site of this well? A. Yes, sir.

"Q. At that time and place I ask you whether or not Mr. Hall in the course of a conversation made the statement 'We took the choke out of the well' or words to that effect? A. Yes, sir.

"Q. He did? A. Yes, sir.

"Q. That is all."

that a Dowell man removed the choke. Nor is there any evidence excluding the possibility that one of the Penrod men removed it or that it might have been blown out by the explosion. The jury may or may not have given probative weight to Poole's testimony We cannot know. The legal distinction between direct evidence and impeaching evidence is a fine one for the lay mind to draw. We think the trial judge should have drawn it carefully and explicitly in his charge to the jury by an explanation more detailed than the brief charge given at the request of the appellant.

While we are quite clear that the vague and uncertain evidence we have discussed was insufficient to justify a verdict for the plaintiffs and that it was error to deny defendant's motion for instructed verdict, we do not rest our decision for reversal entirely upon this point. The charge to the jury is both deficient and prejudicial.

To begin with, this action was brought under article 2315 of the Civil Code of Louisiana, as amended,[7] the pertinent parts of which provide that:

"Every act whatever of man that causes damage to another, obliges him by whose fault it happened to repair it; the right of this action shall survive in case of death * * * should the deceased leave a surviving spouse, together with minor children, the right of action shall accrue to both the surviving spouse and minor children.

\*     \*     \*     \*     \*     \*

"The survivors above mentioned may also recover the damages sustained by them by the death of the parent or child or husband or wife * * * as the case may be."

The trial judge's mention of the statute was confined to quoting only the first phrase to the semicolon, and that without comment. A careful reading of the parts set forth above and of Louisiana case law on the subject shows that under the article two causes of action are given to the named beneficiaries, one the survived action, i. e., the action which the deceased had at the time of death; the other an action given by the Code to the named beneficiaries in their own right for the damages they suffer by reason of the death of their decedent. Eichorn v. New Orleans & C. R. Light & Power Co., 112 La. 236, 36 So. 335, 104 Am.St.Rep. 437; Reed v. Warren, 172 La. 1082, 136 So. 59; Voss, "The Recovery of Damages for Wrongful Death," etc., 1931, 6 Tulane L. R. 201 et seq. In this case decedent was killed instantly; possibly for that reason the complaint of his widow and children makes no claim for damages under the survived action.[8] This suit is brought under the final paragraph of article 2315 and is one by the widow in her own right for herself, and as tutrix for each of the three minors for the damages each suffered by reason of the death of Jowers. The charge to the jury fails to discuss the legal principles applicable and the elements which must be considered in fixing damages in a case of this kind. "Generally speaking, the court should instruct the jury as to the proper measure of

---

[7] For an excellent discussion of the historical development and interpretation of the article, see Reed v. Warren, 172 La. 1082, 136 So. 59.

[8] The pertinent parts of the complaint read:

"(17) That the said Frank Jowers lost his life as a direct and proximate cause [sic] of the negligence alleged in this petition on the part of Dowell Incorporated * * *, and that petitioner and her daughters were thereby deprived of the love and affection of their husband and father and of a livelihood that he was so generously providing them with.

"(18) Petitioner shows that Frank Jowers, at the time that he was killed, was 42 years old; that he was making a salary of $140.00 per week working as driller for Penrod Drilling Company, and that his life expectancy at the time of his death was 26.22 years.

"(19) Petitioner shows that as a direct result * * * of the acts of negligence * * * *they* suffered the following damages [Emphasis added.]:

Loss of wages and loss of
   livelihood .............. $190,871.60
Loss of the love and affection, care and attention of their father, and husband ................. 20,000.00
Mental anguish and suffering caused by the fact that (Jowers) remained in the pit * * * over twelve hours * * * .......... 10,000.00
                                                   —————

Total ............. $220,871.60"

damages in the case and the elements to be considered in fixing them * * *. Thus, it has been said that the jury cannot be left to find any damages to which they think the plaintiff may be entitled, not exceeding the sum claimed in the declaration in an action for damages for personal injuries without any guide as to the basis of the computation." 15 Am.Jur. § 370. Here, each of the four plaintiffs suffers in the same way by reason of Jowers' death, but the extent and degree of suffering will differ in each case, since one plaintiff is the widow and the other three are children of different ages.

"The right of action given to the children which is exercised in this case is a statutory right, and the extent of the relief to be given to them is to be controlled by the evident intent of the statute. The fact that the beneficiaries under the statute are the 'minor' children, and not 'all' the children, of the deceased (the children who were majors at the time of the father's death or who became so before the bringing of suit taking nothing under its provisions) * * * indicates clearly that the object of this law (so far as the children are concerned) was to save them harmless during their minority from the loss of the benefits (material and moral) which they would have received had their father lived up to the time of their respective majorities to provide for their temporary needs—to tide them over to majority under as favorable conditions as they would have been tided over had their father not been killed. We do not think that the amount of property which the father might have possibly earned up to the date of his probable natural death, and which these children might have inherited at that time, enters as a factor in determining to what extent they are entitled to a judgment in their favor. The true question is, what had the children the right to receive from their father during their minority? For the loss of this they are to be compensated. What they were to get after his death would not enter into the case. ₒ

"* * * We think that under the terms of our statute the rights of the widow are not as limited as are those of the children." Eichorn v. New Orleans & C. R., Light & Power Co., 114 La. 712, 38 So. 526, 530, 3 Ann.Cas. 98.

Under Louisiana law, in the case of a widow an element of damages is loss of support during her deceased husband's life expectancy; in the case of minor children, it is an element only during their minority. Amounts recovered for loss of care, guidance, and affection will in some cases differ among the plaintiffs upon the basis of a showing of differing degrees of affection having existed between the deceased and the different plaintiffs, or differing degrees of guidance needed by the minor plaintiffs. Such elements as these should have been dealt with in the charge to the jury. In addition, it should have been explained that the amount of wages earned by Jowers at the time of his death may be considered by the jury along with other evidence in arriving at the degree of support he would have given to his family. The charge as given on this point [9] is an invitation to the jury to figure on the basis of Jowers' life expectancy how much he would have earned during his lifetime, and subtract the amount it would have cost for his own sustenance; the sum thus arrived at would represent what plaintiffs would have received from him. The law does not permit damages to be so calculated in cases like the one before us. There can be no exact rule for measurement of damages applicable to all cases, for the facts of each case must be the basis upon which the amount of the award is predicated. McMahon v. New Orleans Ry. & Light Co., 127 La. 544, 53 So. 857, 32 L. R.A., N.S., 346.

This brings us to a consideration of that part of the charge against which appellants most strenuously complain. The paragraph in question reads as follow: "I might say this, if you reach the question of an amount, the law of the State of Louisiana applies and this is not to control you but I

[9] "A total amount by calculation will not serve your purpose; you will take the age of the man, his life expectancy— his own sustenance would normally be quite a figure and should be subtracted —you take these things and arrive at a lump sum; these amounts are all computed and then the clear profit to the individual is determined."

might indicate to you that in cases in Louisiana of somewhat similar character—some $10,000 or $15,000 say, I do not say that it is too high or too low, but it has been allowed; you have in this case the wife and her individual case of her own, and each of the three children. You have a case here just as if you had four people to deal with instead of one person, each one of whom is entitled to a separate consideration."

We think such a charge was highly prejudicial and calculated to mislead the jury. The statement that this was in effect four suits, is in a sense true, but when it is coupled with the statement of Louisiana law as to amounts allowed in other cases, it is likely to produce just such a result as the one before us. We think it clear beyond argument that the jury was influenced in its mathematical computations by the statement. The trial judge may not in charging the jury refer to a sum suggestive of a proper award. 15 Am.Jur., § 371. We are of the opinion that the error committed is of such gravity that the case must be reversed on this ground also unless the failure of the defendant's (appellant's) attorney to object to the charge forecloses consideration of the point by us.

Rule 51 of the Federal Rules of Civil Procedure, 28 U.S.C.A., following section 723c, provides that no party may assign as error the giving or failure to give an instruction unless he distinctly presents to the trial court his ground for objection. This conforms to the practice generally followed in appellate procedure everywhere. Hence, the error in instructing the jury in this case cannot be complained of by the defendant. If it is considered at all, it must be on motion of the court. The court's right in a proper case to consider on its own motion errors patent upon the face of the record where no objection was made, was considered by the United States Court of Appeals for the District of Columbia in Shimabukuro v. Nagayama, 1944, 140 F.2d 13, 15. We find ourselves in thorough accord with the decision in that case.

"The power of an appellate court on its own motion to consider grounds of error not raised below is not one which should be exercised in an ordinary case.

"But where it is apparent to the appellate court on the face of the record that a miscarriage of justice may occur because counsel has not properly protected his client by timely objection, error which has been waived below may be considered on review. Mr. Justice Black has recently said: 'There may always be exceptional cases or particular circumstances which will prompt a reviewing or appellate court, where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon by the court or administrative agency below.' Hormel v. Helvering, 1941, 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037."

We think that in the interest of justice the court here must act upon its own motion. So acting, we hold that the trial judge's charge to the jury constitutes reversible error.

In the circumstances, the insufficient evidence and the erroneous charge require that the judgment appealed from be reversed, and the cause remanded for proceedings not inconsistent with this opinion.

Reversed and remanded.

McCORD, Circuit Judge, concurs in the result.