Mark SAN ANTONIO and Karen San Antonio, infants under the age of fourteen years, by their guardians ad litem Thomas San Antonio and Betty San Antonio, and Thomas San Antonio, Plaintiffs-Appellees,

v.

Myles TIMKO, Defendant-Appellant.

No. 26, Docket 30439.

United States Court of Appeals
Second Circuit.

Argued Sept. 28, 1966.

Decided Nov. 21, 1966.

Joseph Kane, New York City (Evans, Orr, Gourlay & Pacelli, New York City), for appellant.

Robert J. Keegan, Jr., New York City (George Ammerman, New York City), for appellees.

Before MOORE, FRIENDLY and KAUFMAN, Circuit Judges.

FRIENDLY, Circuit Judge.

In this action in the District Court for the Southern District of New York the plaintiffs, residents of New York, sought damages from the defendant, Myles Timko, a resident of Maryland, for injuries suffered when an automobile owned and operated by him left a highway near Raleigh, North Carolina. The other passengers in the car were Timko's wife Ronnie, his brother Bernard, his step-daughter Betty San Antonio, and her two small children. Mrs. San Antonio and the children were injured and sought recovery; her husband, Thomas San Antonio, was not in the accident but sought compensation for loss of his wife's services. A jury made awards totaling $20,500 and judgment was entered thereon.

Timko's car was going north on a main highway on a rainy morning in April, 1962. As the road curved to the left, the car went off the hard surfaced roadway, traveled 74' on the right shoulder and then 68' down an embankment where it turned over twice. Mrs. San Antonio, the only witness called by the plaintiffs to describe the accident, had been rendered unconscious when the car turned over; she testified that it was going "very fast" and that it had covered between 80 and 90 miles in 60 to 90 minutes. Her testimony was impeached by a statement taken by an investigator early in May, 1962, signed by the four adult occupants of the car, which exonerated Timko of negligence, gave the speed as 40 miles per hour, suggested that the car "must have struck an oil slick," and characterized the mishap as "a freak accident due to a slick and slippery road"; plaintiffs sought to counter this in the usual fashion. Plaintiffs also placed in evidence a report by an officer of the North Carolina Department of Motor Vehicles, made shortly after the accident, which stated that the vehicle had traveled 90 miles in 3 hours, noted that the road was wet (but said nothing about an oil slick), gave the speed as 40–45 miles per hour as against a posted speed limit of 60, and described what happened as follows:

"Vehicle going N. on U. S. 1 passed a car and proceeded to pull back into right lane when vehicle started to skidding."

Neither Timko nor the other passengers testified.

Making, without discussion, the debatable assumptions that the sufficiency of the evidence is governed by state law [1] and that the relevant state law would be that of North Carolina supposedly rendered applicable by New York's conflict of laws,[2] defendant argues the evidence did not warrant submission of the issue of negligence to the jury. He relies on a statement in the leading case of Mitchell v. Melts, 220 N.C. 793, 18 S.E.2d 406, 411 (1942), that "the mere fact of the skidding of an automobile is not of itself such evidence of negligence in the operation of an automobile as to render the owner liable for an injury in consequence thereof." Other North Carolina cases, however, have sustained submission to the jury where there was proof of skidding and something more. Queen City Coach Co. v. Burrell, 241 N.C. 432, 85 S.E.2d 688 (1955); Durham v. McLean Trucking Co., 247 N.C. 204, 100 S.E.2d 348, 68 A.L.R.2d 349 (1957); Wise v. Lodge, 247 N.C. 250, 100 S.E.2d 677 (1957); Hardee v. York, 262 N.C. 237, 136 S.E.2d 582 (1964). Against these decisions, which are somewhat favorable to the plaintiffs although not entirely on point, stands the most recent decision of the North Carolina Supreme Court we have found, Webb v. Clark, 264 N.C. 474, 141 S.E.2d 880, 884 (1965). The court there affirmed the grant of a nonsuit where there were slippery patches of ice and water but the car was being driven carefully at about 35 miles per hour on a cold clear day, and distinguished *Wise* and *Hardee* on the basis that in those cases "the highway was covered with ice * * * ; there was solid ice in the lane all the way down". If we should extrap-olate from Webb v. Clark that rain plus a speed of 40 miles per hour would also not qualify for submission to the jury, plaintiffs' case would have to rest either on Mrs. San Antonio's rather vague testimony that the car was going "very fast" and had traveled 80 or 90 miles in an hour to an hour and a half, or on the basis that the mere recital in the Department of Motor Vehicles report did not establish that the car in fact skidded thereby leaving open an inference that the accident may have been due to inattention, or on a combination of the two.

We find it unnecessary to resolve these issues—a task for which, at least so far as they hinge on North Carolina law, our competence is limited. If the evidence was sufficient under the North Carolina standard or any other, it was barely so. Apart from the very happening of the accident, the only significant evidence of negligence was Mrs. San Antonio's testimony as to the car's speed. This was impaired by her contradictory statement shortly after the accident and by the Department of Motor Vehicles report, although the latter in turn was weakened by the fact that it seems to have represented not an independent observation by the officer but statements to him by Timko or the other passengers. The only other item favorable to the plaintiffs was the inference from Timko's failure to take the stand, 2 Wigmore, Evidence § 289(d) (1940); we assume that, if the other evidence is sufficient to make a *prima facie* case, the jury can be asked to draw this even in intra-family automobile accident actions, although the factual basis for it is tenuous when someone else will pay and

1. Both the Supreme Court and this Court have declined to decide this question. See Dick v. New York Life Ins. Co., 359 U.S. 437, 444–445, 79 S.Ct. 921, 3 L.Ed.2d 935 (1959); Mercer v. Theriot, 377 U.S. 152, 156 (1964); Carlson v. Chisholm-Moore Hoist Corp., 281 F.2d 766, 769 (2 Cir.), cert. denied, 364 U.S. 883, 81 S.Ct. 172, 5 L.Ed.2d 104 (1960); Evans v. S. J. Groves & Sons Co., 315 F.2d 335, 342 n. 2 (2 Cir. 1963); Hooks v. New York Central R.R., 327 F.2d 259, 261 n. 2 (2 Cir. 1964); Mull v. Ford Motor Co., 368 F.2d 713, n. 4 (2 Cir. 1966).

2. If, on the other hand, New York "sufficiency" law controls, the problem that troubled us in Evans v. S. J. Groves & Sons Co., supra, has now been settled in the direction we there predicted. Pfaffenbach v. White Plains Express Corp., 17 N.Y.2d 132, 269 N.Y.S.2d 115, 216 N. E.2d 324 (1966).

its effect on the jury should be correspondingly small.[3] Where the evidence thus barely supports the verdict, an incident at the trial that might be ignored where the case was stronger may demand reversal. See Thomson v. Boles, 123 F.2d 487, 495 (8 Cir.), cert. denied, 315 U.S. 804, 62 S.Ct. 632, 86 L.Ed. 1204 (1942); Stanczak v. Pennsylvania R.R., 174 F.2d 43, 48 (7 Cir. 1949); Jacobsen v. Anderson Trucking Service, Inc., 303 F.2d 449, 451 (7 Cir. 1962). Cf. Glasser v. United States, 315 U.S. 60, 67, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Persico, 305 F.2d 534, 536 (2 Cir. 1962). Since we find the improper summation of plaintiffs' counsel to have been such an incident, we can properly avoid deciding the close question of sufficiency which may become academic or appear in a different light as a result of a new trial. Bryan v. United States, 338 U.S. 552, 559–560, 70 S.Ct. 317, 94 L.Ed. 335 (1950); United States v. Lefkowitz, 284 F.2d 310, 315–316 (2 Cir. 1960).

 Counsel's summation made much of the defense's failure to call Timko and a doctor who had examined Mrs. San Antonio. Although this was proper argument, we can see no occasion for carrying it to such extremes as calling Timko "the villain" and still less for converting it into a personal attack on the character of defense counsel. Canons of Professional Ethics, 15, 17 and 18.

While we might not reverse merely for overindulgence in such pyrotechnics even in so close a case as this, what tips the scale is counsel's outrageous argument that by contesting the amount of damages the defense in effect acknowledged liability.[4] Although defense counsel did not take exception to this, the impropriety of the argument was so flagrant as to constitute "fundamental error," New York Central R.R. v. Johnson, 279 U.S. 310, 318–319, 49 S.Ct. 300, 73 L.Ed. 706 (1929), which we will consider on appeal even though the point was not raised at trial. Ferrara v. Sheraton McAlpin Corp., 311 F.2d 294, 297 (2 Cir. 1962); Dowell, Inc. v. Jowers, 166 F.2d 214, 221, 2 A.L.R.2d 442 (5 Cir.), cert. denied, 334 U.S. 832, 68 S.Ct. 1346, 92 L.Ed. 1759 (1948); Shokuwan Shimabukuro v. Higeyoshi Nagayama, 78 U.S. App.D.C. 271, 140 F.2d 13, cert. denied, 322 U.S. 755, 64 S.Ct. 1270, 88 L.Ed. 1584 (1944); 5 Moore, Federal Practice § 46.02, pp. 1903–04. When we combine this episode with the previous improprieties in summation and the exceedingly thin character of the evidence, we are convinced the judgment cannot be allowed to stand. See F. W. Woolworth Co. v. Wilson, 74 F.2d 439, 442–443 (5 Cir. 1934).

The judgment is reversed and the cause remanded for a new trial.

---

3. Insurers who insist on a "conspiracy of silence" to hide what the jurors almost certainly know, see McCormick, Evidence 357–58 (1954), are thus to some extent hoist by their own petard.

4. "I ask you to consider a simple business-like test of whether Mr. Kane really means it when he says that you have no choice but to bring out a verdict which, in effect, is a medal for the man who drove these people down that embankment. If the defendant isn't solely liable for this accident by his conduct and if these people shouldn't have a verdict, why does Mr. Kane spend so much of his time in his summation belittling the damages? Isn't that carrying water on both shoulders? If you really mean it

when you tell a jury that they have no choice except to find for your client, the defendant, because he is innocent of negligence, why do you then walk to the other side of the street and start saying that the damages aren't as bad as they are supposed to be? Why cross examine that doctor at such great length? The doctor wasn't a witness to the accident. He is a witness as to the damages, because he treated this woman as to her injuries, and that has never been challenged by their doctor. Why belabor the point of damages at the trial, why belabor the point of damages in your summation unless you know that the jury should give these people a verdict and this conversation is only for the purpose of controlling it?"