CAVANAUGH, Judge.
This is an action brought by the plaintiff against the defendant under the Federal Employers’ Liability Act, 45 U.S.C.A. paragraph 51 et seq., to recover damages for injuries to his back by reason of a lumbo-sacral strain which he claims to have suffered when attempting to extract a spike from a cross tie preparatory to re-laying a steel rail in a track which defendant was engaged in building.
The plaintiff alleges that on June 9, 1953, that the defendant was engaged in repairing and installing new and heavier rails on its railroad in Evangeline Parish and on that date he was employed as a section hand to remove spikes from cross ties so that the old rails could be removed and new ones laid in their place; that he was provided with a tool or claw bar to be used by him in said work and that it was old and defective and worn and that the claw part thereof was unfit to use and was dangerous and unsafe to use in pulling said spikes from said cross ties; that the defendant had every opportunity to know of the said defective condition of said claw bar and was negligent in disregarding the danger to be incurred by plaintiff in using the *89 bar; that at about ten o’clock a. m. on the date plaintiff was injured he was using the claw bar seeking to remove a metal spike from a hard firm cross tie and holding onto the handle thereof to prize said spike out of said cross tie; that the claw, on account of the worn and defective condition, came off and from around said spike and over its head, causing him to fall on his right knee, striking the end of a cross tie, or some hard substance, and his left leg going and sliding down the embankment of said railroad and resulting in causing the injuries to and serious permanent impairment of the vertebrae, bones, muscles, nerves, tissues and ligaments in his lower back, left leg and hip. That had the claw of said bar not been worn and defective it would have held around the spike and under its head and as plaintiff prized and pushed down on the handle that the claw was inserted around said spike and would have held had it not been worn and defective; and the defective and worn condition of the bar caused it to slip, causing the plaintiff to fall.
The defendant admitted that it was an interstate carrier and that the plaintiff was in its employ as a section hand but denied that the plaintiff suffered any accidental injuries and denied that the claw bar was worn or defective and affirmatively alleged that the tool or claw bar with which the plaintiff was working was not worn or otherwise defective but was in good condition and without defects. Defendant denied that it was negligent. The defendant affirmatively alleged that the plaintiff prior to and at the time he was injured was working with a claw bar furnished him for use in his work of pulling spikes from cross ties; that the claw bar was in good condition, not worn, broken or otherwise defective; that the plaintiff had a safe place in which to work and his injuries were not due to any carelessness or negligence on the part of defendant, or its employees or agents, but was due and brought about solely through plaintiff’s carelessness and negligence in performing his work and handling said claw bar in a careless and negligent manner.
After trial on the issues reflected by the pleadings the district judge, in a written opinion, rendered judgment in favor of the plaintiff and against the defendant for $7,118, with legal interest from judicial demand until paid.
The defendant has brought the case here on appeal.
The lower court held that the common or simple tool doctrine applied to the case and that the tool or claw bar being used by the plaintiff at the time he was injured under the short time of' his employment and in the light of his inexperience in using such a tool that that doctrine could not apply to him and found that the claw bar being used by the plaintiff was not a simple or common tool. He made the following observation in his written opinion for. finding the defendant negligent under what he considered to be the law of the case:
“The Court has made a thorough study of the authorities submitted both by plaintiff and by the defendant, and coupled with the application of the facts, has come to the conclusion that the principal matter for decision is the application of the common tool rule as applying to the claw bar being used by plaintiff in this case. Plaintiff correctly contends that a claw bar is not a simple tool for other than persons who have used same in railroad track work a long time; that owing to the fact that he had never done such work before the day he was injured, knew nothing about a claw bar, and was provided said claw bar by his Section Foreman a few minutes before he was injured, he did not have opportunity to know of its defective or dangerous condition.
“The evidence in the record indicates conclusively to the satisfaction of this Court, that the plaintiff had never done such work before the day he went to work on the very day he was injured. The positive testimony of the witnesses, Charlie Elliott and Stamps Messer, that the Section Foreman picked up a claw bar off the side of the *90 railroad dump and handed it to plaintiff to use a few minutes before the accident is not contradicted by the Foreman. The testimony of the aforesaid two witnesses to the effect that they saw the claw of the bar slip over the head of the spike and immediately examined the said claw, finding it worn and defective, was not denied nor in any manner contradicted. Their testimony is further to the effect that while they were examining the said claw bar, that the Section Foreman, Mr. Williams, was near them. Williams did not deny their testimony.
“In summary, the Court finds that the plaintiff, from the evidence adduced on trial, that this was his first job at railroading, and that he was given a defective claw bar by the Foreman, and that upon the use of said defective claw bar, he fell when the clip on the claw bar passed over the head of the spike, thus causing injury to the back of the plaintiff. Certainly, from the evidence, there is no other conclusion to be reached but that the defendant was guilty of negligence in providing an inexperienced worker with a defective tool. To say on the other hand, that the plaintiff is to be held to be contri.butorily negligent in the use of this claw bar when he knew nothing of its mechanism, having never used one before, would be a contradiction to the above finding of facts by the trial Court and would lead to a ridiculous conclusion.
“The facts of this case are practically similar to the facts in a leading case of Thompson v. Chicago Great Western [R. Co., 164 Minn. 494], 205 N.W. 439. The Court is also inclined to the belief that it is equally similar to the facts in the case of Cole v. Seaboard Airline Railway Company [199 N.C. 389], 154 S.E. 682. In the Thompson case, the claw bar was selected for use and furnished by the Foreman, which is exactly what the Foreman did in the case at bar. The Court made a close examination and study of the authorities submitted by defendant in this case, but because of his finding of facts as above outlined, the Court finds that all authorities thus submitted are not applicable to the facts in this case.”
The defendant-appellant contends here that the judgment should be reversed on the following grounds:
(1) That the plaintiff did not make out his case.
(2) The fact that the claw bar is a “simple tool” bars recovery by the plaintiff.
(3) The doctrine of comparative negligence and diminution of damages.
The facts in the case show that on the morning plaintiff was employed he was 59 years old and was hired by the section foreman of defendant. He went to work at six thirty a. m. on that day. He had never had any experience in railroading or track work' prior to that time but had followed sawmilling and lumbering all of his life. Plaintiff stated that he was told to get a claw bar. That he did not know what it was and waited and then he picked up one. Two hands worked together, one on the inside and one on the outside of a rail. That he was on the inside and Mr. Elliott was his partner. He stated that it went fine until about nine o’clock when a colored boss came and said “Come go with me in the back” putting in new rails. So after he went down there Mr. Close (the road master in charge of the work) sent him back to pull spikes; that when he returned the claw bar he had been using was gone and that some other worker had picked it up; that he looked for it and the section foreman came around and asked him why he was not working and he told him somebody had his claw bar. Plaintiff said: “The section foreman told me there were plenty of bars around there” and he picked one up from the dump and handed it to plaintiff; and that he started to work and pulled a good many spikes, came to a hard one and slipped and fell; that his left leg slipped and his right knee hit a *91 tie and he fell over on the rail and everything got black. That Mr. Elliott picked him up and then he could see and Mr. Messer, another hand, came over and picked up the bar and they looked at it. It was worn inside. That they had something to catch under the spike, that was worn out. They showed him a good bar, it was not that way. About that time the section foreman came. He told him he was Tiurt. He said, “You’ll be all right tomorrow”. Plaintiff said: “I wish you would take me to the doctor or home”. He said: “You go to the shade.” He went there, •stayed a while, came back up, seen if he could do anything, he couldn’t. “I didn’t try, I was suffering so bad. At two o’clock I said to myself I would go try it. They were setting spikes. I tried to reach over to pick up my maul, I couldn’t do it. I set two spikes and then went back to the shade and met Mr. Close.” He told Mr. Close that he injured himself at nine thirty and was told by him to go to the shade and stay there; that the bar slipped and that Mr. Close said: “Some of the old bars was worn, they will slip out of it if you don’t watch them”. That was all of it. The plaintiff further testified that he did mot hear any orders given to take the bar out that he was using; that he went to Dr. Dupre the next morning and that he treated and examined him. That he made 13 trips for treatment. Dr. Dupre wanted him to stay in the hospital but he was not able to pay and he was requested to remain but that he quit going because he received a letter from the company saying that they would not do anything for him and that is when he turned his claim over to his attorney. He owed Dr. Dupre $118 for medical services.
Plaintiff was asked by his counsel if he would know whether a claw bar was defective or not and he answered in the ■negative and that he was given no instructions as to how to use the bar at the time he went to work.
On January 6, 1954, the defendant took the plaintiff’s deposition at Alexandria, Louisiana. During plaintiff’s cross examination on the trial defendant asked plaintiff, referring to his previous testimony in which he had stated that he did not examine the claw bar, and the following question was propounded to him during the course of the trial:
“Q. Well, on that occasion when the deposition was taken, you just stated that Mr. Messer showed you the claw bar right after the accident, that was defective. On this occasion in Alexandria when we took your deposition, I was asking the questions and I said, ‘Did you examine the claw bar’? Answer: ‘No sir’. After that: ‘Oh yes, I didn’t but my partner picked it up, he has been a railroad man for twenty (20) years’. When did you look at this claw bar? A. I did not look until the other man picked it up after I got hurt.
“Q. You stated in Alexandria you did not look at it at all? A. They showed it to me after they helped me up, the difference in a good one and one worn.”
Mr. Laren, claim agent for defendant, took a statement from plaintiff on July 16, 1953, or about 5 or 6 weeks after the accident happened and plaintiff signed the statement. He was presented with the document and admitted his signature and then defendant’s counsel read a portion from the signed statement of the plaintiff as follows:
“I did not slip or trip or stumble on anything, I had all my power on the claw bar when it slipped off the spike and this is what caused me to fall to my knees and I hit my back. As far as I know the claw bar seemed to be in good condition, and it was just one of those things. These claw bars do slip off spike heads, and that is what caused me to fall.”
The plaintiff testified further on cross examination that he thought that Mr. Laren made a mistake because he did not make the statement ascribed to him in the portion read. He was then further cross *92 examined by counsel as to when he discovered that the bar was defective and he stated that he discovered it when they showed it to him that the bar was different from the other one he had been using and that he did not know except that it was worn and that Messer picked up a good one and showed him • where it wasn’t worn. He further stated that when he first started to work that morning that the claw bar he was using slipped off the heads of the spikes several times because he did not know how to use it, and because he did not get the claw under the head of the spike good, but that in a little while, he learned and did not have any trouble. He stated that at the time he fell and hurt himself that the claw slipped over the head of the spike because it was an old bar and had been worn away. That in his short period of work that morning he had broke some heads off of spikes but that he didn’t fall. He finally admitted that he did not know anything about the bar, only what the men with whom he was working told him. That at the time he signed the statement for Mr. Laren he was on his back in his bed at home and that his wife and the section foreman, Mr. Williams, were present ; that his brother Corbett came in later; that Mr. Laren gave him a carbon copy of the statement and that he turned it over to Mr. Long. That he can not read or write and that Miss Cammie Johnson does his writing and reading. That Miss Johnson read the statement to him when he carried it to her. He stated that he was working in a big field where the track was being laid when the bar slipped and that his left foot slipped down in the dump and as long as the bar did not slip he had plenty of room. That nobody pushed him. That Mr. Messer was up a little bit ahead and that his brother and Mr. Smith was about a rail ahead. He was then questioned again about the statement to Mr. Laren and he asked counsel to read the statement and that portion of the statement read is as follows:
“I had all my power on the claw bar when it slipped off the spike head, and that is what caused me to fall to my knees and hurt my back. As far as I know the claw bar seemed to be in good condition and it was just one of those things. These claw bars do slip off the spike heads and that is what caused me to fall.”
The plaintiff’s answer to that question was:
“No, sir, I did not say that these claw bars do slip off the spike heads, and that is what caused me to fall.”
He was further queried:
“Answer my question; you didn’t make that statement to Mr. Laren, and you couldn’t know it was in the report that you signed, is that what you say? A. The first bar, I told him must have been in good condition.
“Q. Did you say jt or didn’t you say it? I’ll read the last part: ‘As far as I know, the claw bar seemed to be in good condition.’ A. Yes, sir, I told him that.
“Q. ‘And it was just one of those things’? A. I did not say that.
“Q. ‘These claw bars do slip off the spike heads’? A. No, sir.
“Q. ‘And that is what caused me to fall’? A. That is where he made a little mistake.
“Q. You didn’t say those things?
A. No sir, the first bar was in good condition, only slipped a few times because I did not know anything about how to use it. He never asked me about the second bar I used.
“Q. What I just read is bound to refer to the bar you were using when you slipped and fell? A. You was asking about the bar when I just started. I told him the first was in good condition.”
The witness Charlie Elloitt was working with the plaintiff and testified that he was 54 years old and had known the plaintiff for over 30 years and that he (the witness) had been doing railroad work for 20 years. That he is a farmer and works for the *93 railroad from May or June until spring or until the time farming is started. That he had done track and section work. That he used claw bars and mauls; that he was working with the plaintiff when he suffered the injury; that he heard the defendant when it employed the plaintiff; that Mr. Williams, the section foreman, hired the plaintiff and that he was told by the plaintiff that he did not know anything about railroad work; that he worked with the plaintiff when he first commenced to work and then he was asked to tell the Court how the accident happened. He said that he was working with the plaintiff and that he was working on the inside and that plaintiff was working on the outside and they were engaged in pulling spikes until about nine o’clock when a colored foreman came and got plaintiff and carried him back behind. That in about twenty-five minutes the plaintiff came back to where he, the witness, was working and looking for his claw bar and couldn’t find it and that Mr. Williams, the section foreman, picked one up and handed it to him and that they resumed their work pulling spikes; that they pulled a few and hit a hard tie which he imagined was white gum or something and that plaintiff was pulling hard on it and his claw bar slipped off and he fell and that he stepped over the rail, caught plaintiff by the hand, helped him up; that the witness, Messer, picked up the claw bar, looked at it, showed him it was worn at the end of it. That'a claw bar has a plane on the inside, when they are new they hardly ever slip off, the more you use it, maybe sometime it will break at the end and slip over the head of the spikes. He stated that this claw bar was broken right at the end. That it caused it to get wide and that a little plug was worn out. The witness further stated that if you work on the inside, meaning the inside of the rails on the track, when you fall you will hurt your hand and that if you are on the outside it is not as dangerous because you did not have the rails to fall on. That the plaintiff was working on the outside and he slipped down the bank.
The witness never reported to the section foreman that the claw bar was defective and he gives as his reason for not reporting to the foreman that the claw bar was defective because there was lot of them out there in the same fix. Whether he was talking about claw bars being in the same fix or people falling is not made clear by his evidence but it would appear that he was talking about workers falling down on account of defective bars. He did not know of any particular worker who was injured during that time but had known of men being hurt on the job but he couldn’t remember any particular person because it had been too long. The witness testified further that a new claw bar did not slip off of the head of a spike. That the head of the spike the plaintiff was pulling on at the time he suffered the accident was not pulled off; that he had been working on the job two days when the plaintiff was injured and that he had no trouble with the bar he was using slipping; that he did not know about any of the bars any of the other workers were using because he did not pay any attention to them; that he had never worked on the job except where they had some good tools and some bad tools and that if you use a claw bar long enough that it will become worn and this witness finally said that the bar the plaintiff was using could have been defective.
Messer, the only other witness who was present when plaintiff fell, testified that he was 36 years old and that he had worked on the railroad for Gifford Hill for 4 years and about 2 years in a clearing and roustabout gang and that he went to work for the plaintiff the day before the accident happened and that • he was present when the plaintiff was hired. That he saw the plaintiff when he suffered the accident and he accounts for plaintiff suffering the accident in the following words:
“When he got his bar and beared down, there is a flange in that bar that goes under the head and catches the spike, and when that flange wears and gets thin, it will slip off. When you *94 clamp your spike down on it, it will slip over the head.”
That he was working on the opposite end of the same rail the plaintiff was working on and that he saw Mr. Elloitt pick plaintiff up when he fell; that he walked down there and picked up the bar and looked at. it and that he saw the flange had hollowed out to where it did not clamp the spike. That he showed it to Elloitt and plaintiff where it was worn and compared at with a bar in good shape. That the bar slipped over the head of the spike because the flange had hollowed out. This witness further testified that he had worked with plaintiff at sawmilling and had known him all his life. The witness also gave Mr. Laren a statement a short time after the accident happened. He further testified that there were no claw bars available right at the place where they were working and that Mr. Williams, the section foreman, handed the bar to plaintiff he was using and told him to go ahead and work; that the plaintiff could have obtained another bar if he had known that the flange was worn out and thin and chipped off and permitted the bar to slip over the spike head; that the plaintiff had been using the bar about 20 or 25 minutes when the accident happened to him.
Corbett Leyser, a brother of the plaintiff, testified that he was working on the job the day his brother was injured but that he was not present at the place where his brother was working; that the bar he was using was slipping and the road master told him to go get another bar if his bar did not hold the spikes and that instruction was given to him after his brother was injured. This witness was present when Mr. Laren obtained the statement from plaintiff on July 16, 1953, and he signed the statement as a witness and that Mr. Laren read the statement to the plaintiff but he did not know whether Mrs. Leyser followed with the reading by a copy of the statement; that he knew Mrs. Leyser and the plaintiff coud not read or write.
The defendant’s testimony consists of Donald C. Close, road master who was in charge of the work of relaying the rails, Ernest I. Williams, the section foreman, and Harold Laren, the insurance adjuster and investigator. Mr. Close had been in the employ of the defendant since 1930 and at the time the accident happened to plaintiff he was acting as general road master and had general supervision of the relaying of track. He stated that he was there on the job most of the time but that he did not have any personal knowledge that plaintiff was injured on the day he claims to have suffered the accident and that plaintiff did not advise him that he was hurt. He testified that a claw bar is made of drop forged steel, varying in weight from 8 to 14 pounds, depending on the kind and manufacture; that it is made so that the foot having a pronged front and the base of the bar with an opening of a little better than %ths of an inch heeled to the claw bar to give a mechanical leverage when pressure is applied to the upper end or handle of the bar, which is about 5 feet long. A claw bar distance from the point of the claws to the back of the heel is about 6 inches, this varying in type of claw bar used, giving a mechanical leverage of about 12 to 1. The handle of the claw bar is about 1 to 1% inches in diameter. On the end opposite the claws there is a sharp chisel point on the claw bar used in conditions where you need a greater leverage on this chisel point, being tapered back, and a slight bend of which is about 2 inches from the end.
A claw bar is used for extracting the spike from a tie when a tie is to be removed or when you are removing rails in rail relays. They were in the process of a rail relay so were using claw bars for the removal of the spike on each side of the rail so the rail could be changed. That all the claw bars on the job were one piece, all made out of one continuous piece of metal, out of one continuous piece of steel and that there was not anything complicated in using a claw bar and that it did not require an expert or experience in the operation of a claw bar. He saw no reason why the plaintiff could not use a claw bar the same as anyone else except of course experience is always a good teacher and that it would *95 be more valuable to the railroad company and ease to the person using the claw bar if they had had experience. That an inexperienced man would not be able by comparing one claw bar with another to detect that a claw bar was worn or wider than another between the end prongs just by looking at it and that the opening of the prongs would have to be measured. He further testified that the claw bars used on this particular job were sent to Pine Prairie from the railroad store. That all tools sent out from the railroad store are looked over or reconditioned and sent out in a work safe condition and that the tools sent out for this job was the first job that they had been used on since they were received from the store. That when they received their tools they are looked over and that any apparent damaged tool is discarded and that they have rigid rules for foreman in charge to take care of defective tools and not permit them to be used. The witness further testified that he did not know anything about the particular claw bar the plaintiff was using at the time he claims to have been injured. He stated that he did not remember anyone reporting an injury on June 9, 1953, the date plaintiff claims he was injured and that it was some 30 days or more before he learned of plaintiff’s injury. He stated that the practice and instructions of the defendant in the event a person is injured is that the injured person reports to the foreman and the foreman himself takes the injured employee to a doctor and sees that medical attention is given and that if the foreman is not able to relieve himself at the time he sends a competent man with the injured employee and makes a wire report to the superintendent of the defendant and follows it up with an injury report in full detail, giving the reason, how the injury happened and the witnesses to the injury. He stated that the weather was extremely hot at the time the work was being carried on and on this particular day defendant had several men complaining of the heat which was caused by them not being accustomed to working on the track out in the sun and that the company furnished them with salt tablets and that several of the men had cramps in their hands and legs from working in excess heat. That when these men said anything about that they were told to take a little rest or go to the edge of the right of way in the shade and in some cases ice water was poured on their hands when cramped and that any man could go to the shade when he felt bad because they are the only ones who know their feelings and that you can’t say when a man is too hot and it was left up to the individual worker himself. This witness was not cross examined by plaintiff.
Ernest I. Williams, section foreman of defendant and who hired the plaintiff, had been in the employ of the defendant since April of 1941. He was foreman on the job at the time the plaintiff was injured. He testified that he had no recollection of plaintiff having been injured on June 9, 1953, nor does he recall anybody being injured on that day. That he did not recall giving the plaintiff the claw bar or did not recall giving any one particular man a claw bar. That it was his duty to see that the men had tools to work with aijd that he gave the.plaintiff a claw bar; that he remembered hiring the plaintiff and of plaintiff telling him that he had had no experience but denied hearing of plaintiff being injured; that there were 33 men in his crew and about 10 men were working with the colored section foreman. That after these crews got started out the men were probably about a mile apart. That the colored foreman worked his men mostly and that the witness worked all of the men under his control. That the job had started June 8, or one day before the plaintiff claims he was injured and at the time the accident happened he was living in Pine Prairie.
The witness further testified that the first he knew of the plaintiff having suffered an accident or injury was when Mr. Laren came to his house and told him that the plaintiff had made a claim. The witness further stated that there was nothing complicated about the mechanism of a claw bar and that it would require no experience in using it.
*96 The witness Harold Laren, the claim agent and adjuster for the defendant company learned about plaintiff’s claim about six weeks after it happened when Dr. R. E. Dupre of Ville Platte, Louisiana, had made a report of an examination he made of plaintiff on July 7, 1953. This witness stated that he took a statement from Mr. Leyser at his home at Turkey Creek in the presence of Mr. Leyser’s wife and Mr. E. I. Williams, the section foreman, and that after he had typed the statement plaintiff’s brother, Corbett Leyser, sat through most of the statement; that he wrote the statement out by propounding questions to Mr. Leyser and then writing his answers down as closely as he could and that he read the statement aloud to Mr. Leyser and this witness stated that Mrs. Leyser followed the reading of the statement as he read it aloud to the plaintiff; that if it was not Mrs. Leyser it was his impression that someone read the statement along with him. This witness was then asked the same question whether or not plaintiff made the statement alluded to him hereinabove recited and the witness stated that he did and that he read the whole statement back to him and that there was one or two words in the entire statement that had to be changed and that he thought the changes were that where he meant bar he put spike and whether it was more than that he did not know. Frequently in typing your statement you may get your description mixed, get west for east, you may put down spike instead of bar and it has to be changed when it was read back. The witness stated that he took a statement from Corbett Leyser, the plaintiff’s brother, after obtaining Allen Leyser’s statement at his home. That he took a report from A. F. Smith of Turkey Creek and took a statement of Ernest I. Williams, section foréman, but did not take one from Charlie Elloitt. That in taking the statements he tried to write down what the witness said in his own language.
On cross examination this witness was propounded the following question by plaintiff’s counsel:
“Q. I am going to show you a few instances to show you I think you didn’t use his language: He told you at the time that he found the claw bar was defective. Didn’t your statement show he was using a defective bar? A. flSTo sir, I believe I asked him if there was any defects about the bar that he knew. I believe his answer was that he said he knew of none. I believe my wording in the report was to the effect that: ‘I know of no defects’, or ‘the bar was not defective insofar as I know’.”
The witness further stated that he found the plaintiff to be very fair and frank and that he was not trying to cover up anything.
The witness Ernest I. Williams was recalled and testified that he was present when the statement was taken from the plaintiff and that it was read aloud back to plaintiff and that he did not indicate any disagreement with any of the statements read and that the lady present at the time the statement was being read back followed by a carbon copy and he thought it was plaintiff’s wife and it looked to- him like she was reading it.
The plaintiff recalled Stamps Messer and he testified- in rebuttal that the time that they were looking at the bar showing the difference where the one was worn, Mr. Williams, the section foreman, came by and that he heard the plaintiff say “Mr. Williams I am hurt. I got to go to a doctor”. He said “You will be all right this afternoon or tomorrow” and that he heard him make that statement and that they were all looking at the bar at the time he (Williams) came by. He was asked on cross examination why didn’t he report the bar being defective and he stated that he figured that was the foreman’s job and not his job and that he showed Elloitt and the plaintiff that it was worn.
The. pivotal point in the case is whether or not the tool was defective and would not catch the spike when the claw was applied under pressure. The witnesses Elloitt and Messer fqr plaintiff were positive in their testimony that it was worn and a piece or sliver broken off. They looked at the bar immediately following the accident. They *97 did not demonstrate the imperfection of the bar by attempting to extract a spike immediately following the accident and did not call the imperfection of the bar to the attention of the section foreman Williams. The testimony of Close was that the bars when they were sent out on the job from the tool house were in safe working condition and at that time they had been examined. Williams has no recollection of giving any particular employee any particular bar and that he would not give an employee a defective bar.
The positive testimony of the witnesses Elloitt and Messer that the bar was defective coupled with the corroborative testimony of the witness Corbett Leyser that the bar he was using was slipping and that the road master told him to get another one to work with establishes the fact of negligence on the part of the defendant and warrants recovery under the statute.
Close, the road master, did not have any knowledge of plaintiff suffering an accident and plaintiff did not tell him he had suffered an injury. Williams, the section foreman, did not recall or have any recollection about plaintiff or any other employee being injured on the day plaintiff claims he suffered the accident. The evidence of Close that on account of the employees suffering cramps in their hands doing this heavy type work, specially during the hot weather, and not being accustomed to the heat they are supplied with salt tablets and are told to retire to the shade of the right of way when they get too hot or experience this cramp in their hands. The statement of the section foreman Williams that he did not recall plaintiff saying he was hurt can not be construed as evidence that plaintiff did not experience the accident or report to him the injury when plaintiff is corroborated in his statement that he did tell him that by the witness Messer.
The contradictory statements made by plaintiff to Laren, the claim agent, as well as the testimony given by him in Alexandria when his deposition was taken could only be considered as impeaching testimony and could not be considered as direct evidence to show whether plaintiff actually experienced the accident and resulting injury as claimed. This prior testimony or the statement which the claim agent took from the plaintiff could only be used as impeaching testimony and then the entire statement should have been offered in evidence so the court could have determined its effect. Dowell, Inc., v. Jowers, 5 Cir., 166 F.2d 214, 2 A.L.R.2d 442; Leininger v. New Orleans Ry. & Light Co., 150 La. 1089, 91 So. 521.
The only question presented in this case is whether or not under the facts which we have hereinabove attempted to analyze is whether or not the tool furnished by defendant was defective and its use contributed in whole or in part to proximately causing the accident and injuries to plaintiff. It is a question of fact decided by the lower court in favor of the plaintiff. The legal question of whether the simple tool doctrine should apply or whether the claw bar was not a simple tool has nothing to do with the case.
The amendments of the Federal Employers’ Liability Act by the act of 1939 did away with the defense of assumption of risk. The law relied upon by the trial judge and which he cites relative to the simple or complicated tool doctrine has been obsolete since the amendment of the Federal Employers’ Liability Act in 1939. The pertinent sections of this statute, as amended, read as follows:
The Federal Employers’ Liability Act, 45 U.S.C.A., paragraph 51, provides:
“Every common carrier by railroad while engaging in commerce between any of the several States * * * shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce * * * for such injury * * * resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, *98 works, boats, wharves, or other equipment.”
The 1939 amendment, 45 U.S.C.A., paragraph 54, provides:
“ * * * any action brought against any common carrier * * * to recover damages for injuries to, * * * any of its employees, such employee shall not be held to have assumed the risks of his employment in any case where such injury * * * resulted in whole or in part from the negligence of any of the officers, agents, or employees of such carrier.”
45 U.S.C.A., paragraph 53, provides:
“In all actions * * * brought against any such common'carrier * * to recover damages for personal injuries to an employee, * * * the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee * *
The claim of a plaintiff under this statute is based on negligence and if he can show any negligence at all on the part of the defendant under the statute and that it proximately caused the accident and injuries he is entitled to recover. The right and cause of action created by the statute is a Federal right created by Congress and the jurisprudence announced by decisions of the Federal appellate courts are controlling. The common law defenses of assumption of risk, fellow servant doctrine, simple tool, primary duty and all such defenses which could have been urged prior to the amendment of 1939 were swept aside by the United States Supreme Court in the case of Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 63 S.Ct. 444, 451, 87 L.Ed. 610. The statute for all practical purposes has in effect been made a workmen’s compensation statute by the highest court of the nation. The Court in this case said:
“The doctrine of assumption of risk can not be ‘abolished in toto’ and still remain in partial existence as the court below suggests. The theory that a servant is completely barred from recovery for injury resulting from his master’s negligence, which legislatures have sought to eliminate in all its various forms of contributory negligence, the fellow servant rule, and assumption of risk, must not, contrary to the will of Congress, be allowed recrudescence under any other label in the common law lexicon. The Act of 1908 and the amendment of 1939 abolish the post-Priestly v. Fowler defenses and authorize comparison of negligence instead of barring the employee from all recovery because of contributory negligence. They leave for practical purposes only the question of whether the carrier was negligent and whether that negligence was the proximate cause of the injury.”
See also Pitt v. Pennsylvania R. Co., D. C., 66 F.Supp. 443; Griswold v. Gardner, 7 Cir., 155 F.2d 333; Federal Employers’ Liability Act-Richter and Forer, 12 F.R.D. 13; Jacob v. City of New York, 315 U.S. 752, 62 S.Ct. 854, 86 L.Ed. 1166.
The only medical testimony offered in the case to establish the nature and extent of plaintiff’s physical injuries and disability was that of Dr. R. E. Dupre of Ville Platte. He testified that he saw the plaintiff on the day following the accident. Plaintiff went to his hospital in Ville Platte and gave him a history of how he strained his back. His back was X-rayed and the X-rays were negative for any fracture. Plaintiff’s pain at that time was entirely in the lum-bosacral region and he displayed the usual posture of a person suffering with acute lumbosacral strain and according to the witness at the time he saw him he was very much in pain and the doctor asked him if he wanted to stay in the hospital and the plaintiff told him he could not afford it because he did not know whether he could pay for the treatments. The doctor told him to keep coming back for treatments and he put a lumbosacral belt on him to support his back and gave him sedatives and administered electronic and diathermy treatments to his back. Plaintiff reported periodically for the treatments but having no *99 convenient way to get to the hospital to take the treatments the doctor wrote the defendant on August 6, 1953, and advised it that plaintiff was being treated at his hospital and asked them about the bill plaintiff was incurring. He was advised that the defendant did not intend to pay it but to look to plaintiff for payment. The doctor continued the treatments because he thought the plaintiff needed the treatment and he continued the treatment until the time of the trial. At the time of the trial the doctor’s bill for services amounted to $118. The physician thought that he made a moderate charge for the services. He examined the plaintiff the day before the trial and he thought the plaintiff was disabled and believed most likely that he had a ruptured disc but that would have to be determined by myelography by a competent orthopedist. The doctor’s evidence is that the plaintiff was complaining with pain in his back in the region of the lumbosacral joint and his movement is limited and the flexion of his legs is terminated especially on the left side. He found some evidence of atrophy in the left leg. He had been the plaintiff’s family physician for 20 years and as far as he knew the plaintiff had never had any trouble with his back.
The plaintiff was also examined by Dr. Edmond C. Campbell, an orthopedic specialist of Lake Charles, Louisiana, and the plaintiff attempted to file in the record a copy of his report of an examination made of plaintiff on December 4, 1953. The defendant had the examination made and a copy of the report was furnished to plaintiff’s counsel. The judge, on objection of defendant, would not permit the report of Dr. Campbell to be filed in the record.
The lower court awarded the plaintiff $118 for medical fees, $5,000 for loss of earnings and $2,000 for physical and mental pain, or a total judgment of $7,118.
The appellant contends here that the amount awarded is excessive and not supported by the evidence and especially with reference to the item of $5,000 allowed for loss of earnings. The plaintiff testified that he earned and for the past years had earned on the average of $1,500 per year working on various jobs. He did not support his statement with a copy of his income tax return or any other evidence to show the source of his income. The examining physician did not testify as to the probable duration of plaintiff’s disabling condition. Neither did he give any evidence to show that the plaintiff’s disability was permanent. X-ray examination was negative for any pathology. The case was tried on March 23, 1954, or about ten months and two weeks after the accident happened. He only treated the plaintiff with diathermy or electronic heat on 13 occasions between the date of the accident and the time of the trial.
Plaintiff argues seriously that since defendant had plaintiff examined by Dr. Edmond C. Campbell that if he had been permitted to file his report in evidence it would have further established his disabling condition. We do not know, in the absence of Dr. Campbell’s report, what his findings were but since the plaintiff did not allege or prove any permanent injuries and the court below did not make any award for permanent injuries, under the cases we have examined and decided by the courts of this State on the question of quantum the award of the judge below appears to be excessive. See West Louisiana Digest, Damages, <®==>132(15) e. The burden was on plaintiff to show the nature and extent of his injuries and the quantum to be awarded to him has to be supported by the evidence.
We believe that an award of $3,618 will fully compensate plaintiff for his loss of earnings, physical and mental pain and the medical fees he owes under the evidence contained in the record.
For the reasons assigned the judgment appealed from is affirmed, amended however to reduce the award from $7,118 to $3,618 and as amended the judgment is affirmed.